# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-01468-SCT

*BRIAN A. BAILEY AND JANET M. BAILEY LAPP*

*v.*

*THE ESTATE OF WILLIAM G. KEMP,
DECEASED, JOE KARR, EXECUTOR, ANDREW
T. MOSES, JR. AND MARTHA KEMP*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/15/2005 |
| TRIAL JUDGE: | HON. TIMOTHY E. ERVIN |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JOHN H. FREELAND |
| | MICHAEL REED MARTZ |
| | JOHN TAYLOR MOSES |
| ATTORNEYS FOR APPELLEES: | WILLIAM K. DUKE |
| | THOMAS J. SUSZEK |
| | JONATHAN MASTERS |
| | LYNN CHAIN COOPER |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND RENDERED IN PART; ON CROSS-APPEAL: AFFIRMED - 03/22/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., DIAZ AND DICKINSON, JJ.**

**DIAZ, JUSTICE, FOR THE COURT:**

¶1. This is a case about whether a contract granted property rights to two individuals.

## STATEMENT OF THE CASE

¶2.     After her husband died in 1976, Janet Bailey Lapp decided to use the proceeds from his life insurance policy to invest in real estate. She granted her son Brian Bailey, a graduate student at Purdue University, full power of attorney to purchase property and manage it as he wished. Brian invested the money into rental properties in Indiana and Florida, but by 1979 the investments had not gone as well as planned, and the decision was made to sell the struggling properties.

¶3.     Bailey turned to a Holly Springs lawyer named William G. Kemp and a specialist in distressed real estate properties named Andrew Moses. Kemp had long provided legal representation for Janet Bailey Lapp. Strapped for cash, Bailey could not pay the two men for their services, so a deal was struck: Kemp and Moses would negotiate the legal and financial complexities of the sale of the properties in return for a cut of the proceeds. Janet Bailey Lapp would recoup her investment with interest, and the remaining amount would be split equally among Bailey, Kemp, and Moses.

¶4.     The arrangement was detailed in a contract signed by five parties—Bailey and his wife Lynn, Janet Bailey Lapp, Kemp, and Moses. Each party to the contract signed separately and before a notary public. Because of the geographical distances between the parties, it took roughly a month for the contract to be signed and finalized.[1] The contract, which purported to be retroactive to June 21, 1979, ran to eleven pages and covered in great detail the status of the Bailey family investments and the work Moses and Kemp would

_____

[1]Brian and Lynn Bailey signed in Florida on September 10, 1979; Janet Bailey Lapp in Pennsylvania on September 28; Kemp in Mississippi on November 7; and Moses in Georgia on November 15.

perform for the family. It emphasized the complexity of the work involved and the personal efforts Kemp and Moses had invested in the process; that the Bailey family currently had no funds with which to pay the two professionals; and that Kemp and Moses agreed to only be paid if the properties could be successfully sold.[2]

¶5. This formal contract also expressly incorporated a informal seven-page "memorandum of understanding" (MOU) that had been signed by the same parties on June 28, 1979. The MOU was much more detailed in setting forth the problems the Baileys would face in selling the properties and how the payments between the parties would occur.

¶6. The contract required that Brian Bailey and his wife execute a promissory note to his mother in the amount of $225,000, plus eight percent interest. This note would be offered as full compensation and restitution for her investment in the various properties and was to be accepted in lieu of profits from the sale. In other words, as the contract declared, the note was for any equity interest she had in the properties. After that note was satisfied, the remaining monies would be split equally three ways among the Baileys, Kemp, and Moses.

¶7. Nearly all the properties were sold over the following months, and the money was disbursed in accordance with the contract: Janet Bailey Lapp received the $225,000 plus

[2]For instance, among the portions of the contract addressing the work performed by Kemp and Moses one notes: "[i]t being recognized and agreed that the said Andrew T. Moses, Jr. and William G. Kemp, have performed and are performing professional and personal services of immeasurable value on behalf of Janet McNair Bailey Lapp, Brian A. Bailey and Lynn B. Bailey, which have consumed considerable amounts of time and have created substantial expense to both of said parties, as to which the undersigned have not had any money with which to reimburse said parties and as to which, because of many variable factors, it does not appear that there will be sufficient amounts of money with which to reimburse said parties for their services in the foreseeable future.

interest due her, and Bailey, Moses, and Kemp each received roughly $109,000. There was also $19,623.89 left over from the various transactions, which was stored in the First State Bank in Holly Springs.

¶8. Still, one property remained—the Florida property, which was purchased in 1978 for $91,000, had yet to be sold. Over the course of the next decades it increased in value to nearly eight hundred thousand dollars. Who owns that land is the subject of today's appeal.[3]

¶9. Kemp passed away in 1998, and his estate filed a declaratory judgment action in Marshall County Chancery Court against Brian Bailey, Bailey's ex-wife, his mother, and Andrew Moses.[4] The action sought to formally establish that Kemp possessed a one-third interest in the Florida property, as well as a one-third interest in the $19,623.89. Notably, the Estate of Kemp also asked that any property in which it was deemed to have an interest be sold.

¶10. Bailey and his mother then filed a complaint in Marshall County Chancery Court against the Estate of Kemp and Moses, among others, asking in pertinent part that any purported interest in the Florida property asserted by Kemp and Moses be set aside; that Kemp and Moses provide the Bailey family a full accounting for all funds handled over the years on their behalf; and alluding to professional negligence by Kemp and Moses. The case was consolidated with the ongoing declaratory judgment action.

¶11. The chancery court ultimately rendered a 32-page opinion and a 33-page judgment detailing its findings. Of the 95 findings of fact and judgment by the court, most were

[3]The ex-wife of Brian Bailey, Lynn, is not part of this appeal.

[4]Moses was later realigned as a plaintiff alongside the Estate of Kemp.

resolved in favor of the Estate of Kemp and for Moses. The contract and the MOU were read together, deemed valid, and the court found that "the inescapable conclusion is that the Agreement should be enforced as it is written and in the manner the parties intended in 1979." The court found that the claims by the Baileys against Kemp and Moses and their efforts to exclude them from the contract were barred by laches and the general statute of limitations for tort actions.

¶12. The $19,623.89 left in the bank was ordered divided in one-thirds among Brian Bailey, the Estate of Kemp, and Moses. The Florida property was ordered to be sold and the proceeds split in the same fashion. In the alternative, Bailey was given the option of having the land appraised and then paying two-thirds of the value to the Estate of Kemp and Moses to "buy out" their ownership.

¶13. Aggrieved, the Baileys sought relief from this Court, arguing six errors: first, that the Moses and the Estate of Kemp waited too long to seek an enforcement of their rights; second, that Indiana law should apply in this case; third, that Moses and Kemp cannot benefit from the contract without a Indiana real estate license; fourth, that Moses and Kemp took advantage of the Baileys' trust; fifth, that compound interest was warranted; and finally, that the transfer of Janet Bailey Lapp's home to Kemp was invalid.

¶14. As the Baileys asserted in their brief, "[t]his is not a complicated case." We agree. At its heart, this is simply a contract dispute. The multiple assignments of error—which span 93 pages, far in excess of the extremely permissive 75 pages allowed by MRAP 28(g)—really state only two claims: first, is the contract entered into by the parties in 1979 still enforceable, and if so, to what extent? Second, was the transfer of Janet Bailey Lapp's

house to her attorney William Kemp valid? We will consider Moses' request for attorneys' fees separately.

## Standard of Review

¶15. On review, we generally defer to a chancery court's findings of fact unless they are manifestly wrong or clearly erroneous. *Saliba v. Saliba*, 753 So. 2d 1095, 1098 (Miss. 2000). We use a de novo standard of review when examining questions of law decided by a chancery court. *Id.*

¶16. In the case at hand, the Baileys urge that we soften our deference to the trial court, arguing that it wholly adopted the findings of fact and conclusions of law presented by Moses or the Estate of Kemp. We have previously cautioned that "the judge is a judge and not a rubber stamp," but in light of "[c]ase complexities and crushing caseloads," we have held that "a trial court may adopt verbatim, in whole or in part, the findings of fact and conclusions of law of a party," and this matter "is within the court's sound discretion." *Rice Researchers, Inc. v. Hiter*, 512 So. 2d 1259, 1266 (Miss. 1987). Still, "[w]here the trial judge wholly abdicates his judicial responsibilities . . . we doubtless have authority to intervene," as such failure of duty constitutes an abuse of discretion. *Id.*

¶17. From a review of the record it is clear that the trial judge, while adopting wholly the findings of fact of the Estate of Kemp, did not adopt in toto the conclusions of law, striking through roughly one full page of the proposed ruling. Accordingly, we need not shift our standard of review.

### I. The Contract for Services.

6

¶18.    Moses and the Estate of Kemp seek the enforcement of the contract between the parties because they wish to gain the financial benefits from the sale of the Florida property. The property was appraised in 2002 at roughly $798,000, and if sold at that amount Moses, the Estate of Kemp, and Brian Bailey would each receive $266,000. First we must determine if the contract is enforceable at this late date.

**A.  Is the contract still valid?**

¶19.    The Baileys urge that the contract entered into with Kemp and Moses is invalid for a number of reasons, among them breach of fiduciary duty, duress, fraudulent concealment, and lack of adequate consideration. The chancellor found no flaws in the contract and upheld it in its entirety.

¶20.    Indeed, the terms of the contract are laid out clearly and at length. The Bailey family received exactly what was promised under the contract:  the satisfaction of Janet Bailey Lapp's loan, plus 8% interest, the avoidance of bankruptcy, and hundreds of thousands of dollars in proceeds after all transactions were completed. The evidence demonstrated that the debt against the properties was roughly $1,405,587, and that the efforts of Moses and Kemp resulted in proceeds of $1,978,180, or a net result of $572,593.[5]

¶21.    It is axiomatic that estoppel forbids one from both gaining a benefit under a contract and then avoiding the obligations of that same contract. "A party cannot claim benefits under a transaction or instrument and at the same time repudiate its obligations." ***Wood Naval***

---

[5]Although there are references in the contract and the MOU regarding the creation of a trust to pay out the sums of money, no evidence that a legal trust was ever created was presented to the chancellor.

***Stores Export Assn. v. Gulf Naval Stores Co.***, 220 Miss. 652, 664, 71 So. 2d 425, 430 (1954). This doctrine, termed "quasi-estoppel," "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position [it has] previously taken," and "applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." ***Bott v. J.F. Shea Co., Inc.***, 299 F.3d 508, 512 (5th Cir. 2002). This is exactly the situation at hand; the Baileys cannot profit under this contract and also seek to have it declared invalid where their obligations under the contract are concerned.[6]

¶22. Estoppel also works against the sudden concerns about the amount of fees that Kemp and Moses received. The nature of the fee split was laid out explicitly in the contract and the previous MOU, and the contract expressly stated at great length and detail that "[i]t is understood and it has been discussed that the fees to Andrew T. Moses, Jr. and William G. Kemp may be substantial when finally paid. However, it is further understood and agreed between the parties that, under the magnitude of the circumstances in which they have worked and are continuing to work . . . . said fee arrangements . . . are considered by all parties to be perfectly reasonable under the circumstances and exigencies of the situation." Janet Bailey Lapp even testified at trial that she did not read the contract, although Kemp had read portions of it to her. However, "[u]nder Mississippi law . . . parties to a contract have an inherent duty to read the terms of a contract prior to signing; that is, a party may neither neglect to become familiar with the terms and conditions and then later complain of lack of

_____

[6]This is also the reason why the Baileys' insistent arguments that Moses worked without a Indiana real estate license must fail, for they received the benefit of his efforts.

knowledge, nor avoid a written contract merely because he or she failed to read it or have someone else read and explain it." ***Miss. Credit Center, Inc. v. Horton***, 926 So. 2d 167, 177 (Miss. 2006). The Baileys cannot now complain of the fee arrangement which they entered into freely and benefited from.[7]

¶23. Further, "to invalidate a contract on grounds of economic duress, the complaining party must establish: (1) that the dominant party threatened to do something which he had no legal right to do; and (2) that the wrongful threat overrode the volition of the victim and caused him to enter an agreement against his free will." ***Kelso v. McGowan***, 604 So. 2d 726, 732 (Miss. 1992). The trial court found no evidence of such conduct surrounding the formation of the contract, and as noted above, all parties signed over a series of weeks in the presence of a notary public.

¶24. Lastly, the contract should be upheld as a matter of equity. The parties, all educated persons, knowingly entered into a highly-detailed and specific contract. To avoid the obligations it created would now mean a windfall for Bailey, despite the contract's express intention to endure until its terms were completed.[8]

¶25. Accordingly, the chancellor was correct in finding the contract to be valid.

### B. Did the statute of limitations run against the Baileys' claims?

---

[7]Brian Bailey declined to testify at trial, and so the factual record supporting his contentions was not extensive.

[8]The death of a party to the contract was specifically contemplated: a survival clause "assure[s] that the guarantees and fee arrangements set forth . . . will be performed and fulfilled by the surviving parties to the maximum extent possible and such untimely or premature death shall not constitute grounds for a forfeiture of the rights of any party to this contract."

¶26. The Baileys asserted a host of claims against the Estate of Moses and Kemp, who plead both the running of the statute of limitations and laches. The chancellor found that the general three-year statute of limitations applied and that laches barred any equitable claim. This statute of limitation, which has been applied to actions upon contracts, requires that one must commence an action within three years of its accrual. Miss. Code Ann. § 15-1-49 (Rev. 2003). Laches can only apply when a claim is barred by the statute of limitations. *Miss. Dept. of Human Servs. v. Molden*, 644 So. 2d 1230, 1232 (Miss.1994) ("Laches is never applicable when a claim has not been barred by the statute of limitations").

¶27. The chancellor determined that the last activity under the contract occurred in 1993, and that the three-year statute had run in August of 1996. The Baileys' complaint—which was not a counter-complaint in the declaratory judgment suit filed by the Estate of Kemp, but originally a separate action—was filed on June 29, 2000. The trial court ruled that the action was barred by the statute. Such factfinding is well within the purview of the trial court, and there was no evidence, despite the claims of the Baileys, of any fraud or concealment on behalf of Moses and Kemp. Accordingly, the claims of the Baileys are barred by the statute of limitations.

¶28. The chancellor further found that laches operated to bar the purported causes of action. The defense of laches applies when one party neglects to assert a right or claim, and such neglect, when taken together with any lapses of time and other circumstances causing prejudice to the adverse party, operates as a bar in a court of equity. As with other questions of law, "[t]he question of laches is addressed to the sound discretion of the chancellor and

10

his decision will not be overturned on appeal except where there is an abuse of discretion." *Molden*, 644 So. 2d at 1233.

¶29.    In determining whether laches can be applied, the court looks to three considerations. The party seeking to invoke the doctrine of laches must show: (1) a delay in asserting a right or claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted.  *Grant v. State*, 686 So. 2d 1078, 1089 (Miss.1996) (internal quotations and citations omitted).   The trial court found that these factors were satisfied, and that the prejudice under the third prong arose in two ways.  First, Kemp could no longer testify to defend himself against the complaints of the Baileys, as he had passed away two years before their suit was filed.  Second, the property had increased in estimated value by several hundreds of thousands of dollars, to the benefit of the Baileys.

¶30.    There is nothing in the record to suggest that the chancellor abused his discretion in determining that laches applied to bar any claims against Kemp or the Estate of Moses. Additionally, the crux of the Baileys' complaint regarded actions performed by Kent and Moses that actually benfited the Baileys, and as noted above, they are estopped from now protesting the work.

### C.  Did the statute of limitations run against Moses and the Estate of Kemp?

¶31.    The contract detailed how the Bailey family would retain and pay for the professional services of Kemp and Moses in their quest to sell property.  Because Moses and Kemp wish to now gain the benefit of the remainder contract, the Baileys urge that we apply Section 15-1-49 of the Mississippi Code, which applies to contracts for professional services, and requires that actions based upon them commence within three years after the accrual of the

11

cause of action. Miss. Code Ann. § 15-1-49 (Rev. 2003); *In re Estate of Stewart*, 732 So. 2d 255, 258 (Miss. 1999).

¶32.    In short, the Baileys contend that by filing for declaratory judgment in 1998, Moses and the Estate of Kemp simply waited too long to assert their rights to the Florida property under the contract. The family offers that the last service rendered under the contract by Kemp and Moses was in 1987, and so any lawsuit would have had to be filed by 1990. The chancellor rejected this argument without elaboration.[9]

¶33.    The very first sentence of the contract makes clear it is for professional services which were not "solely legal services," but also a "myriad of other services and counsel in other areas." However, the argument of the Baileys assumes that the contract has been wholly performed, and that Moses and the Estate of Kemp are only now seeking payment for their services. This is not quite the case. Instead, those parties are looking for the contract to be enforced as written; they seek to hold the Baileys to the letter of the contract, which would provide them with a one-third share in the proceeds of the sale of the Florida property. In exchange for services, which were numbered as thirteen separate items in the contract, Moses and Kemp were to receive proceeds from the sale of the property. As specifically outlined in the MOU:[10]

> The broad outline of the arrangement which we have discussed is that we would take the total gross sales price of all properties, deduct the cash expenses, in terms of debts owed to the banks or any other parties, deduct the mortgages, deduct the amount guaranteed to Janet [Bailey Lapp], deduct out

[9]As an aside, laches was not pled as a defense by the Baileys.

[10]As noted above, the Kemp-authored MOU was expressly incorporated into the contract.

of pocket expenses and split the remaining equities one-third to Brian and Lynn [Bailey], one-third to Andy [Moses] and one-third to myself.

All of these conditions occurred save one: the Florida property was never sold. Because a component of the contract remains to be fulfilled, the statute of limitations has not begun to run. In contracts, "[t]he general rule is that the statute of limitations begins to run as soon as there is a cause of action." *Old Ladies Home Ass'n v. Hall*, 212 Miss. 67, 80, 52 So. 2d 650, 655 (1951). Had Bailey sold the property years ago and refused Moses and Kemp their one-third shares, we would have a different issue. Because Bailey has not yet sold the property, the statute of limitations has not run. *See Old Ladies Home*, *supra* (limitations period does not begin to run upon nonperformance of contractual duty until the cause of action accrues).

**D. The Florida Property.**

¶34. Of the multiple properties contemplated by the contract, only the Florida property was not sold. The chancellor originally ordered its sale, mandating distribution of the net proceeds to the three parties. Later, the judgment was modified to provide two alternate solutions: first, that Bailey could first purchase the one-third "shares" of Moses and Kemp after an appraisal of the property to ascertain their value; alternatively, Bailey could judicially partition the property.[11]

¶35. The contract and MOU repeatedly use the term "contingent" to describe the interest Moses and Kemp have in the proceeds from the sale of the property. Indeed, in their briefs

---

[11]Moses and Kemp have recorded liens on the property, and an unspecified sum of money has accrued from rents on the land. After the divorce of Brian and Lynn Bailey, Brian moved onto the property and now claims it as a homestead under Florida law.

the attorney and real estate expert defended themselves against allegations of overcharging for services by noting their payment was bargained-for and contingent. The contract states that "each of the said parties has agreed to accept his compensation for such services on a partially deferred basis, as set forth in said memorandum contingent upon the financial result of these services heretofore and hereafter to be performed by each of them." The contract also states that "when all properties *have been in fact liquidated and all proceeds of sale received*, adjustments would be made as between the parties . . . to assure that all parties receive their appropriate distributions." (Emphasis added).

¶36. The use of the term "contingent," and the express and plain language of the contract requiring the sale of all the properties, indicate that two events are conditions precedent to Kemp and Moses receiving further fees. First, the Florida property must be sold. Second, the sale must be effected by Moses and Kemp for them to receive their portion of the fees. From the findings of the trial court it is clear that neither of these conditions have been satisfied.

¶37. We cannot guess at the intent of the parties, but the facts tell a compelling story. The Baileys were in a dire financial situation. Kemp and Moses helped them out of the situation by selling the beleaguered Indiana properties, for which they received a healthy fee. Once the Baileys were out of financial danger, the pressing need to exert great time and effort (without hourly fees) to sell the remaining property in Florida simply disappeared, and the parties apparently retreated to their respective spheres. The contract was born of need and was useful only when the Baileys were in financial danger. Once the danger had passed, none of the parties pressed to fulfill the remainder of the contract to sell the Florida property.

14

¶38.    The trial court committed an abuse of discretion in ordering the sale or partition of the Florida property.  Even ignoring the sticky jurisdictional issues involved with a Mississippi court demanding the sale of a Florida homestead, such a result was never contemplated by the contract.  If and when two conditions precedent are satisfied, Kemp and Moses may receive their one-third fee.[12]

### II.  Was the Transfer of Janet Bailey Lapp's House to Her Attorney Valid?

¶39.    The Baileys argued on appeal that the chancellor erred by finding that the transfer of Janet Bailey Lapp's former Holly Springs home to her attorney, Mr. Kemp, was valid.  However, her testimony at trial was clear on the subject:

> I realized that I wanted to sell the property.  I also knew that the Kemp family owned property very close to my property . . . [a]lso, I had been very appreciative of what Mr. Kemp had done for me over the years, and it was my idea to show my appreciation.
> . . .
> I was going to sell the property to him with a provision that a certain amount of the value of the property would be a gift from me.

This gift occurred in 1994, and for the four years until his death Kemp paid Janet Bailey Lapp a small amount each month.  The record also demonstrated that she allowed the Estate of Kemp to pay off the existing mortgage on the house, roughly $10,000, and the house was not actually transferred to Kemp's name until after his death.  This claim seems related to the other general claims of misconduct asserted against Kemp, none of which were brought

---

[12]The demise of a party does not necessarily mean that a contract such as this might not be enforced; the actions of that party during life may effect a change long after their passing, and the proceeds could still accrue to the party's estate.

during his lifetime. Still, there is no evidence that chancellor committed error in allowing the transfer of the property. The judgment is affirmed.

### III. Is Moses Entitled to Attorneys' Fees?

¶40. Moses requested that this Court award attorneys' fees because he claims the case against him was wholly without merit. He urges that the Baileys have continually misrepresented key facts to the Court, and details at length those supposed misrepresentations. The chancellor denied an award of fees.

¶41. "The standard of review regarding attorneys' fees is the abuse of discretion standard, and such awards must be supported by credible evidence." *Miss. Power & Light Co. v. Cook*, 832 So. 2d 474, 486 (Miss. 2002). While the law underpinning this case may be simple, its history is highly involved, requiring the trial court to navigate in factually deep waters. Ultimately, the declaratory judgment action brought by the Estate of Kemp was joined by and benefited Moses, as it supported his claim to a one-third share in the proceeds from any sale of the Florida property. The claims brought against Kemp and Moses attempted to invalidate the contract and any ability of Kemp and Moses to recover under it. The Baileys' complaint essentially served as an answer to the complaint of Kemp and Moses, especially after the two actions were consolidated.

¶42. Accordingly, the chancery court did not abuse its discretion in declining to grant attorneys' fees to Moses.

### Conclusion

¶43. This case spans decades and involves substantial sums of money. The trial court struggled diligently with a voluminous record and thousands of pages of documents, as well

16

as a complicated multi-day trial. Ultimately this is a simple case of contract interpretation. The contract is valid, although the time to contest it has been barred by the statute of limitations and by the defense of laches. The interests of Moses and the Estate of Kemp in the proceeds from the Florida property still exist, but have not yet vested, as the property has not yet been sold. The transfer of Janet Bailey Lapp's house to Kemp is valid and Moses is not entitled to attorneys' fees.

¶44. **ON DIRECT APPEAL: AFFIRMED IN PART; REVERSED AND RENDERED IN PART. ON CROSS-APPEAL: AFFIRMED.**

**SMITH, C.J., WALLER, P.J., CARLSON, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. COBB, P.J., NOT PARTICIPATING.**