997 So.2d 967 (2008)
POINT SOUTH LAND TRUST and Dean Roffers, Trustee, Appellants
v.
Ramon GUTIERREZ, Back Bay Casino of Biloxi, LLC and Bayview Gutierrez, LLC, Appellees.
No. 2006-CA-01127-COA.
Court of Appeals of Mississippi.
December 16, 2008.
*969 H.R. Wilder, Gulfport, Thomas C. Anderson, Leo Ernest Manuel, Gulfport, attorneys for appellants.
Michael B. McDermott, Les W. Smith, Biloxi, attorneys for appellees.
Before KING, C.J., GRIFFIS, and BARNES, JJ.
BARNES, J., for the Court.
¶ 1. Point South Land Trust and Dean Roffers, Trustee (collectively, "Point South") appeal the judgment of the Chancery Court of Harrison County, second judicial district, which granted summary judgment to Ramon Gutierrez, Back Bay Casino of Biloxi, LLC, and Bayview Gutierrez, LLC (collectively, "Sellers"). Point South, the purchasers, had sued Sellers for specific performance on a contract for the sale of real property.[1] Finding no error, we affirm.

STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. This dispute began in January 2005, when Roffers, acting as trustee for Point South Land Trust, entered into negotiations with Gutierrez for the possible sale of the property at issue. The property has access to the waters of the Back Bay in Biloxi, Mississippi; thus, it is suitable for, and had been marketed as, a gaming site. On January 24, 2005, Point South executed a promissory note for $100,000, "issued as a non-refundable down payment on a Contract for Sale" of 9.2 acres of land from Gutierrez to Point South. The note stated the full amount of the principal and interest was due February 23, 2005. On January 25, 2005, Point South executed a contract for the sale and purchase of the real property in the amount of $3.5 million, including a $100,000 "cash down payment," which the contract stated was to be paid at closing.[2] The contract required: (1) that all regulatory permits[3] held by Gutierrez *970 be assignable to Point South, that this assignability be acknowledged by the governmental agency at issue, and there be no tidelands lease that would affect the use of the property; (2) evidence of satisfaction of all obligations against Back Bay Casino; (3) a clean fee simple title be conveyed; (4) certain discrepancies between the title description and the survey be resolved; and (5) proof of Back Bay's being in good corporate standing with the State of Mississippi. The contract provided the closing date would be January 31, 2005, and expressly stated that "time is of the essence." The contract also stated the "[c]losing date shall be extended up to thirty (30) days if any of the following occurs: (A) Mutually agreed to, (B) Title defects are reported which may be reasonably cured, (C) The terms of the purchase contract require a new mortgage...."
¶ 3. In a letter dated January 27, 2005, a representative of Point South wrote Gray Slay, a Biloxi real estate broker involved in the transaction, stating the attorneys for both parties were discussing the various documents necessary to close the transaction, and noted that if additional time were necessary to resolve any issues, the contract provided an automatic extension of thirty days for certain occurrences. On January 28, 2005, Point South's attorney, James Schmidt, faxed a letter to Sellers' attorney, Michael McDermott, listing numerous issues Point South wanted addressed before the closing, including the transferability of the various permits held and a discrepancy between the original survey and the property's legal description contained in the chancery court clerk's land deed records, which created a "gore."[4] It became apparent that the parties would be unable to close on January 31, and they mutually agreed to extend the closing thirty more days, or until March 2, 2005, in order to cure the defects in the title and thereby satisfy Point South's concerns.[5]
¶ 4. On January 31, 2005, Point South did not provide a financing commitment letter to Sellers. However, on February 2, 2005, Point South's lender, Capital Financing Services Corporation (Capital Financing) wrote a letter to Roffers explaining that his requested loan to purchase the 9.2 acre casino site had been approved. On February 22, 2005, First American Title Company (First American) issued a commitment for title insurance, completed by Sellers' lawyers, which was based on a second survey performed by Moran Seymour & Associates (Moran Seymour) in order to satisfy concerns of Point South's lender and attempt to cure the discrepancy between the survey and the legal description. While this second survey was being performed, an issue arose with Point South concerning another possible title defect: the vacation of a right-of-way on Fountain Lane, a Biloxi street, which had apparently been closed without notation in the land records. To satisfy Point South's concerns, Sellers provided a copy of a 1994 City of Biloxi resolution demonstrating that the street had been closed, thereby claiming the street presented no defect of title.
¶ 5. On February 25, 2005, another commitment for title insurance was issued to *971 Point South, upon its request, by the Lawyers Title Insurance Corporation (Lawyers Title). Point South later claimed that this was the proper basis for the exceptions that needed to be cured in order to close, not the First American commitment. The effective date of the letter was March 16, 2005, after a third survey, which was also prepared by Moran Seymour, was examined.
¶ 6. As of February 28, 2005, Sellers took the position that they had met all of the particulars of the contract for sale. However, on March 2, 2005the mutually extended deadline for the closingPoint South's lender, Capital Financing, wrote Point South advising it that, before financing could be finalized, a new appraisal, as well as another updated survey, were required, due to the discrepancy in the acreage shown in the second Moran Seymour survey, which found the property to be 8.37 acres, and not 9.2 acres, as was stated in the contract for sale.
¶ 7. Additionally, two days later, on March 4, 2005, McDermott received notification from Point South that Capital Financing had cancelled its loan commitment because Point South had failed to pay a required $3,500 security deposit. However, the record contains e-mail correspondence from Point South's attorney, Schmidt, to McDermott that a new loan commitment would be issued on March 8, 2005, and Schmidt further explained that the cancellation was erroneous. In a letter dated March 8, 2005, Gutierrez notified Roffers that the $100,000 promissory note, due and payable to Gutierrez on February 23, 2005, was in default, and he demanded payment by March 11, 2005. The record does not reflect whether Point South made any response to this demand. On March 16, 2005, Point South requested from Sellers an extension until March 31, 2005, in which to close. After consideration, Sellers offered to extend the deadline until this date, but only upon execution of an extension agreement, a mutual release, and an additional promissory note in the amount of $50,000.
¶ 8. Rather than accepting the offer, on April 4, 2005, Point South sued Sellers in the Harrison County Chancery Court for specific performance of the contract for sale and filed a lis pendens against the property.[6] In response, Sellers counterclaimed against Point South, contending that Point South's lis pendens constituted slander of title. Also, Sellers sought damages for tortious interference with a prospective business advantage.
¶ 9. On October 25, 2005, Sellers filed a motion for summary judgment, with supporting documents and affidavits, claiming there was no genuine issue of material fact, and Sellers were entitled to judgment as a matter of law on Point South's claim of specific performance, as well as their own counterclaims. A hearing was held regarding the motion on December 15, 2005, at which time Point South hand delivered a response to Sellers' itemized facts *972 and its response to the motion for summary judgment.[7] Sellers moved, ore tenus, to strike the documentation provided at the hearing. On the merits of the case, Sellers argued that, in accordance with the documentation submitted in support of their motion for summary judgment, by the end of February 2005, Sellers were "ready, able and willing to tender performance," and they had met all conditions imposed by the contract. Specifically, they argued that the Moran Seymour survey "cured the problem" with the legal description and identified a Mississippi Department of Marine Resources wetlands permit and an Army Corps of Engineers harbor dredging permit, which they showed to be transferrable. Sellers also pointed to a City of Biloxi resolution indicating that Fountain Lane had been closed and noted that the authority for the limited liability company to transfer the documents had been prepared. Sellers argued that the contract allowed for one extension of up to thirty days, and since the contract stated "time is of the essence" and Point South did not perform its part of the contract, Sellers no longer had to perform. Sellers further argued that Point South's failure to pay the unconditional promissory note in accordance with its terms was a material breach of the contract.
¶ 10. Point South countered that Sellers apparently had "seller's remorse" and were trying to get out of the deal because another purchaser had made a more lucrative offer. Counsel for Point South admitted that the survey "cured the problem,"[8] but he argued that the first day Sellers were able to give good title was on March 29, 2005. In making this contention, however, Point South's counsel relied upon the affidavits which had not been filed prior to the hearing. When asked by the chancery court about payment on the promissory note, counsel for Point South replied: "my client's position was, he'll pay them if they'll just do what they're supposed to do. They executed that note, and that contract is one deal." Counsel never referenced any continued issue regarding Fountain Lane or transferability of permits.
¶ 11. On January 30, 2006, the chancery court entered an order striking Point South's response to the itemized facts and affidavits because they were untimely[9] and granting a partial summary judgment to Sellers regarding Point South's specific performance claim. The chancellor found the requirements stated in the contract to which Sellers were subject were fully met. The chancellor stated that either Point South's failure to close on the contract or failure to pay the $100,000 promissory note was a ground sufficient to find for Sellers. Since Point South breached the contract, the chancellor found that Sellers were entitled *973 to summary judgment for Point South's specific performance demand.[10]
¶ 12. On March 1, 2006, Point South filed a motion to reconsider the partial summary judgment. Represented by new counsel, Point South argued that the record was insufficient to support the chancellor's finding that Sellers had satisfied all their requirements under the contract. First, Point South alleged that Sellers did not cure all title defects prior to the closing date as: (1) the record does not support the finding that the "gore" was cured; (2) the issue regarding Fountain Lane "had not been cured until after March 4, 2005, when a copy of a resolution of the Biloxi City Council was delivered to [Point South]"; (3) while a February 2005 Moran Seymour survey showed the actual acreage to be 8.37 acres,[11] an additional appraisal and survey required by Point South's lender was not completed until March 16, 2005; and (4) outstanding liens resulting from litigation against Sellers existed prior to the March 4, 2005, closing date. Second, Point South argued that Sellers had neither provided documentation as to the transferability nor acknowledgment thereof by the applicable government agency of any permit, except for the Mississippi Department of Marine resources wetlands permit.[12] Third, Point South argued that the "unauthenticated"[13] First American title commitment was insufficient to prove that Sellers satisfied all their requirements under the contract as it reflected only 8.37 acres rather than 9.2 acres, identified a seller different than the one named in the contract ("Bayview Gutierrez, LLC" and not "Raymon Gutierrez and Back Bay Casino of Biloxi, LLC"),[14] and did not identify the coverage being provided or whether the coverage has a co-insurance component. Lastly, Point South argued that the chancery court erred in finding that default on the promissory note was an independent basis to find Point South in breach of contract. For the first time, Point South noted the contract did not reference the promissory note, but instead provided for a $100,000 "cash down payment [to be] paid at closing and subject to adjustments and prorates" and the balance of $3.4 million to be paid at closing. Point South argued that either the contract, which was dated after the promissory note, *974 modified the note, or the two documents "must be viewed as stand alone agreements," where the breach of the promissory note was of "no consequence" to the contract for sale.
¶ 13. At the hearing on the motion to reconsider, Point South's new counsel told the chancellor he hoped to provide "better guidance through the information which was submitted in support of the motion for summary judgment, guidance which [he] believe[d] was lacking when the motion was initially presented and defended in this court." In addition to the matters previously raised in its motion for reconsideration, Point South represented to the court that it had erred in referring to the February 2005 survey as an "ALTA survey"[15] as it did not contain an ALTA certification. Point South further explained that the March 15, 2005, survey was "a true ALTA survey" as it contained the certification detailing steps the surveyor had taken in order to comply with the ALTA requirements.[16] As to the description of the property, Point South argued that since the contract required Sellers to transfer 9.2 acres, and the legal description attached to the Gutierrez affidavit indicated that he only owned 8.37 acres, the affidavit proved that Gutierrez could not comply with the contract.
¶ 14. Contrary to its position in the motion for reconsideration, Point South argued at the hearing that the 1994 City of Biloxi resolution had not cured the Fountain Lane matter and an "amended resolution," attaching a legal description of the portion of the street to be vacated, was required to clear title. Point South noted that both the Lawyers Title and First American title commitments had referred to an "amended resolution" being required.[17]
¶ 15. Point South thus argued that "the information which was accepted and reviewed by the court on its face contains questions of material fact" precluding summary judgment.
¶ 16. When asked by the chancellor why these issues had not been raised prior to the date of the summary judgment motion hearing, Point South's counsel had no answer. The chancellor stated that he was "extremely concerned that nothing was done up until the day that this was set for hearing and even then what was done was extremely deficient. And basically what you are asking for is a second bite at the apple." After taking the matter under advisement, the chancellor denied the motion, asserting that while the court had the "right to review or reconsider its prior holding," it was under no obligation to take into consideration information that was not timely presented and which was stricken at the summary judgment stage due to untimeliness. The chancellor concluded that, based on what was before him at the time he granted summary judgment, his ruling was correct. On June 23, 2006, the chancery court entered its final judgment in favor of Sellers, dismissing the action with prejudice. Point South filed a timely notice of appeal.
¶ 17. After oral argument before this Court, the parties were granted several stays of the proceeding, beginning in July 2007 until April 7, 2008, in order to consummate *975 a settlement. Subsequently, Point South filed a motion to enforce the settlement agreement on April 10, 2008, or, in the alternative, continue to stay the proceedings. The motion and arguments surrounding it, which will be discussed in more detail below, were never resolved. Therefore, pending before this Court are Point South's appeal of summary judgment in favor of Sellers and its April 2008 motion to enforce the settlement agreement.

STANDARD OF REVIEW
¶ 18. "This Court reviews summary judgments de novo." Stallworth v. Sanford, 921 So.2d 340, 341(¶ 5) (Miss.2006) (citation omitted). "[T]he pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," properly before the trial court, will be reexamined by this Court in order to determine if there is any genuine issue of material fact. M.R.C.P. 56(c). The evidence will be analyzed in the light most favorable to the non-moving party. Moss v. Batesville Casket Co., 935 So.2d 393, 399(¶ 17) (Miss.2006) (citation omitted).
¶ 19. A trial court's denial of a motion for reconsideration is reviewed for abuse of discretion. LeClerc v. Webb, 419 F.3d 405, 412 n. 13 (5th Cir.2005) (citing Westbrook v. Comm'r of Internal Revenue, 68 F.3d 868, 879 (5th Cir.1995)). "Reconsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly." Id. (quoting Templet v. HydroChem, Inc., 367 F.3d 473, 479 (5th Cir.2004)).

ANALYSIS

I. SELLERS' MOTION FOR SUMMARY JUDGMENT
¶ 20. Generally, Point South argues, as it did on motion for reconsideration, that the record does not support the chancellor's findings that Sellers satisfied all of the requirements under the contract or that Point South breached the contract by failing to close and to pay the promissory note.
¶ 21. The law regarding summary judgment is well established. Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c). The movant bears the burden of proving that no genuine issue of material fact exists. Moss, 935 So.2d at 398(¶ 16) (citation omitted). "A material fact is one which resolves any `of the issues, properly raised by the parties.'" Strantz ex rel. Minga v. Pinion, 652 So.2d 738, 741 (Miss.1995) (quoting Stegall v. WTWV, Inc., 609 So.2d 348, 351 (Miss. 1992)). On the other hand, in order for the non-moving party to survive summary judgment, "[t]he non-moving party may not rest upon allegations or denials in the pleadings but must set forth specific facts showing that there are genuine issues for trial." Massey v. Tingle, 867 So.2d 235, 238(¶ 6) (Miss.2004) (citing Hardy v. Brock, 826 So.2d 71, 74(¶ 14) (Miss.2002)) (emphasis added). "[T]he presence of fact issues does not per se entitle a party to avoid summary judgment. The court must be convinced that the factual issue is a material one, one that matters in an outcome determinative sense." Id. at (¶ 7) (quoting Hudson v. Courtesy Motors, Inc., 794 So.2d 999, 1002 (¶ 7) (Miss.2001)).
¶ 22. Point South begins its argument by stating that the chancery court improperly made "findings of fact" in its order, instead of determining no genuine issue of material fact existed. While the chancery court's order did label its findings as "findings of fact," we find no error.[18] *976 The chancery court did not improperly act as the fact-finder, despite the caption in the order. The chancellor determined the facts he set forth in his order were not in material dispute, and we agree. See, e.g., Pursue Energy Corp. v. Miss. State Tax Comm'n, 968 So.2d 368, 369(¶ 2) (Miss.2007) (in summary judgment order, the facts were "ably" set out in chancellor's "Findings of Fact and Conclusions of Law").
¶ 23. The chancellor found the requirements of the contract had been met by Sellers, and Point South's subsequent failures to close and to pay the promissory note had breached the contract. The chancellor found that either Point South's failure to close or its failure to pay the promissory note was a proper basis for summary judgment on the specific performance claim. We find that the majority of Point South's arguments in opposition to the partial summary judgment were articulated subsequent to the initial ruling. In determining whether summary judgment is appropriate, it is not the trial court's responsibility to identify the material facts in dispute; but the parties' responsibility. See Massey, 867 So.2d at 238(¶ 6). Point South did not do this.
¶ 24. In order to prevail on a motion for reconsideration, "the movant must show: (i) an intervening change in controlling law, (ii) availability of new evidence not previously available, or (iii)[the] need to correct a clear error of law or to prevent manifest injustice." Brooks v. Roberts, 882 So.2d 229, 233(¶ 15) (Miss. 2004) (citation omitted). Regarding the propriety of reconsidering a judgment, the United States Court of Appeals for the Fifth Circuit has stated that "`[r]econsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly.' A motion for reconsideration may not be used to rehash rejected arguments or introduce new arguments." LeClerc, 419 F.3d at 412 n. 13 (internal citation omitted). Nor may it be used "to resolve issues which could have been raised during the prior proceedings." Westbrook, 68 F.3d at 879 (citations omitted). We find this is exactly what Point South was attempting to do.
¶ 25. As stated earlier, we review a trial court's denial of a motion to reconsider for abuse of discretion. LeClerc, 419 F.3d at 412 n. 13. Having reviewed the record in detail, including exactly what evidence and arguments the parties presented to the chancellor prior to his grant of summary judgment, and the later "guidance" offered by Point South on its motion for reconsideration, we cannot find that the chancellor erred in granting summary judgment or in denying Point South's motion to reconsider.
¶ 26. We will, for the most part, address the arguments in the order in which they were raised by Point South: (1) whether the record before the chancery court contains disputed issues of material fact concerning whether Sellers met the requirements stated in the contract; (2) whether Sellers' failure to cure title constitutes a material breach of contract; (3) whether Sellers were required to extend the closing date further when they failed to cure all the defects in the title prior to "the first closing date extension" of March 2, 2005; (4) whether any breach of the promissory note could form the basis for the breach of the real estate contract since the contract makes no reference to the promissory note, and was in conflict with it; and (5) whether the chancery court relied upon improper evidence in granting summary judgment.

*977 1. Whether the chancery court erred in finding that Sellers met all the conditions for closing.
¶ 27. Point South contends that Sellers did not cure all title defects prior to the closing date as (1) the record does not support that the "gore" was cured, and (2) the February 2005 Moran Seymour survey showing that the property description showing 8.37 acres rather than 9.2 acres was "a new title defect" created by Sellers.
¶ 28. With respect to the "gore," Point South's argument is based on the fact that, while the McDermott affidavit implied the gore was cured, McDermott never actually said so.[19] Point South's original counsel had represented at oral argument, however, that the gore had been "cured" by the Moran Seymour survey. If he was attempting to intimate that it was only cured by the later Moran Seymour survey, his point was not clear. In any event, Point South's contention is without merit as its counsel admitted the gore was cured. Further, we do not find that the chancery court erred in not perceiving the change in acreage from 9.2 to 8.37 acres to be a material fact precluding summary judgment. As Sellers point out, Point South sued for specific performance of the contract knowing that only 8.37 acres were available for sale. Obviously, the change in acreage was not material to the dispute. Moreover, Point South has identified no way in which this "defect" can be cured.
¶ 29. Point South further contends that the chancery court erred in stating that the February 2005 survey was an "ALTA survey" as the record does not contain a copy of the survey. In making his ruling, the chancellor had relied upon the unchallenged affidavit of McDermott who implied that the February 2005 First American title commitment was based upon the ALTA survey. While nothing other than the affidavit supports the chancellor's findings, nothing contradicts it or shows there to be a genuine issue of fact. As previously noted, when referring to the ALTA requirements and certifications in arguing on its motion for reconsideration, Point South was referring to matters that are not contained in the record. We cannot find that the record reflects that the chancellor erred, or that if he erred, it was material. Point South failed to show that the closing could not have gone forward on the First American title commitment. The chancellor noted in his order granting partial summary judgment that there was "no proof other than [Point South's] naked and unsupported allegation" that a commitment from Lawyers Title was required for closing. While Point South contends for the first time in its appellate brief, that the First American title commitment was ineffective because it did not contain an ALTA Endorsement form 19, addressing the contiguity of multiple parcels, we again note that the ALTA requirements and forms are not part of the record, and Point South has failed to preserve this matter for appeal.
¶ 30. As to the Fountain Lane defect, while Point South's complaint referred to the Lawyers Title commitment which required an "amended resolution," at the summary judgment stage Sellers pointed to the 1994 resolution by the City of Biloxi, which they claimed cured the defect. No objection was made by Point South. On motion for reconsideration, *978 Point South argued that Fountain Lane "had not been cured until after March 4, 2005, when a copy of a resolution of the Biloxi City [Council] was delivered to [Point South]." It was not until its rebuttal in support of the motion for reconsideration that Point South finalized its contention that an "amended resolution" was still required. We cannot find that the chancellor erred in concluding that this requirement had been met. Nor do we find it inequitable for the chancellor not to reopen its decision on reconsideration.
¶ 31. As to the outstanding judgment lien against the property, there was no allegation in the complaint identifying this as an issue. We note, however, that the Lawyers Title commitment attached to the complaint, indicates that "Sellers have represented to the company that a settlement of this matter has been reached with the plaintiff and that at closing all claims, judgments and liens vested in plaintiff will be released in exchange for payment of $150,000." While Point South argued at the hearing on the motion for summary judgment that the compromise was not tendered to Lawyers Title until March 29, 2005, the affidavit upon which it relied was stricken due to its untimeliness.[20] We thus find nothing in the record, besides Point South's allegations in its motion to reconsider, that the matter was outstanding on March 2, 2005.
¶ 32. Lastly, with respect to the governmental permits, the contract stated that all federal, state, county, city, U.S. Army Corps of Engineers, and Department of Marine Resources permits held by Gutierrez were to be assignable, and this fact must be acknowledged by each agency. However, Point South's complaint only mentioned a special use site permit for the City which Sellers allegedly had not provided. Sellers, in their motion for summary judgment, cited evidence of assignability of the permits. Point South did not raise any objection to the documentation regarding the assignability of the permits before summary judgment and offered no evidence that any of the permits were not assignable. Nothing in the record indicates that acknowledgment from the agency of assignability of the permits was material to the parties, and in fact, in the January 28, 2005, letter from Schmidt to McDermott, he writes of the different ways to work through the transfer of the permits. It was not until the motion for reconsideration that Point South began to assert that acknowledgment of the assignability of the permits was material. We cannot find that the chancellor erred in failing to consider the permits unmet requirements of the contract; nor do we find it inequitable to hold Point South to its prior position.

2. Whether Sellers' actions constituted a material breach of contract.

3. Whether Sellers were required to extend the closing date further.
¶ 33. Based on the foregoing, we cannot find that the chancery court erred in its conclusion that Sellers had met all requirements for the March 2, 2005, closing. To the extent the motion for reconsideration points to the possible issues of fact in this regard, we do not find it inequitable for the chancery court to have refused to grant the motion. It is undisputed that on the extended closing date, Point South's lender required a different survey and a new appraisal, thereby indicating that Point South was unable to close at *979 this time. Accordingly, taking all of Point South's later arguments and "guidance" into consideration, while neither party may have been ready to close, neither party put the other in breach of contract. We find Gunn v. Heggins, 964 So.2d 586 (Miss.Ct. App.2007) instructive in this situation. In Gunn, this Court held specific performance was not an appropriate remedy when neither party is ready, willing, and able to perform his or her duties under the terms of a contract at the time performance is due. Id. at 592(¶ 10). The buyer, Gunn, entered into a contract to purchase property from the seller, Heggins. Id. at 589(¶ 2). Gunn, however, did not have financing in place in order to purchase the property until after the extended date for closing had passed, and then the loan approval was contingent upon clear title being obtained. Id. at 590(¶ 7). The chancellor found the seller had not breached the contract by refusing to sell the property to Gunn because Gunn did not tender performance during the term of the contract, which had a clearly defined closing date and a fifteen-day extension to the closing date. Id. at 589(¶ 3), 590(¶ 7). We quoted the Mississippi Supreme Court that: "One party cannot maintain an action [for specific performance] against the other without showing performance or a tender of performance on his part." Id. at 592(¶ 10) (quoting Marshall County v. Callahan, 130 Miss. 271, 286, 94 So. 5, 6 (1922)). We continued that, when performances to be done under an exchange of promises are due simultaneously, "it is a condition of each party's duties to render such performance that the other party either render or, with manifested present ability to do so, offer performance of his part of the simultaneous exchange. However, when it is too late for either party to make an offer to perform, both parties are discharged by the non-occurrence of a condition." Id. at 590-91(¶ 7) (quoting Restatement (Second) of Contracts, § 238) (emphasis added). We held that where time was of the essence to the contract, and neither party was ready, willing, and able to perform the contractual duties on the closing date, the contract terminated. Id.
¶ 34. In the present case, as in Gunn, the purchaser never tendered performance until after the 30-day extension had expired. After this date, to the extent there was a genuine issue as to whether Sellers were ready, willing, and able to perform their contractual duties, both parties would be discharged from performing their parts of the exchange because it was "too late for either party to make an offer to perform." See id.
¶ 35. In Ferrara v. Walters, 919 So.2d 876, 886(¶ 30) (Miss.2005), the Mississippi Supreme Court reversed a trial court's ruling that the purchaser's refusal to close constituted a material breach, and the sellers were thereby excused from performing under a real estate contract. The supreme court held that the purchaser's refusal to close occurred because of a defect in the title that was not properly cured by the sellers. However, "[i]nasmuch as time was not of the essence, the onus was on the [s]ellers to correct the defects in title and to render to [the purchaser] that which he bargained for under the contract." Id. (Emphasis added). In contrast, in the instant case, time was explicitly "of the essence"; thus, Sellers were under no duty to correct the defects of title after the expiration of the extended closing date, and they could not be found in breach of the contract. See id.
¶ 36. Point South contends that when Sellers were unable to close on March 2, they were required to extend the closing date further. As previously discussed, we do not find that the chancellor *980 erred in determining the lack of any genuine issue of material fact as to whether Sellers had met all the obligations under the contract. Nevertheless, we find Point South's argument that the contract required further extension without merit.
¶ 37. The Mississippi Supreme Court has delineated that the initial step in contract interpretation is to read the "four corners" of the document in order to gather the intent of the parties through the language used in their agreement. One South, Inc. v. Hollowell, 963 So.2d 1156, 1163(¶ 10) (Miss.2007) (citing Pursue Energy Corp. v. Perkins, 558 So.2d 349, 352 (Miss.1990)). The contract should be read as a whole "to give effect to all of its clauses." Id. at 1162(¶ 10) (citing Brown v. Hartford Ins. Co., 606 So.2d 122, 126 (Miss. 1992)). Intent in the words of the contract should be sought first before resorting to parol or extrinsic evidence. One South, Inc., 963 So.2d at 1162-63(¶ 10). Only when the contract is unclear should the court go beyond the contract to determine the parties' intent. Id. at 1162(¶ 10) (citing Pursue Energy, 558 So.2d at 352). The reviewing court's concern will be more with what the parties said, and not so much with what they intended, since the words employed in the contract are the best estimate of intent. Id. (citing Simmons v. Bank of Miss., 593 So.2d 40, 42-43 (Miss.1992)).
¶ 38. The contract states Sellers have a "reasonable time" to cure any title defects that may be revealed, but the timing is "in accordance with the terms herein," meaning that Sellers were only obligated to cure title "as expeditiously as possible and to execute and tender [a] Warranty Deed" within the thirty-day extension of the contract, which expired on March 2, 2005. Nowhere does the contract require that, if purported title deficiencies are not resolved to Point South's satisfaction, the contract's closing date would be extended indefinitely until resolved. Time was, after all, expressly made "of the essence" by the contract.

4. Whether Point South failed to honor the promissory note.
¶ 39. The chancellor also found Point South's failure to pay the promissory note to be a ground for breach of contract and, thus, granted summary judgment for Sellers. The promissory note, which was signed on January 24, 2005 by Roffers, called for payment of the full $100,000 on February 23, 2005. The note explained that it was "issued as a non-refundable down payment on a Contract for Sale of Land relating to 9.2 acres owned by Raymon Gutierrez to Point South Land Trust in the amount of $3,500,000 inclusive of this note payment." On March 8, 2005, Gutierrez notified Roffers that the $100,000 promissory note, unconditionally due on February 23, 2005, was in default, and he demanded payment. Point South did not come forward with payment, and the record does not reflect whether Point South made any response to this demand.
¶ 40. On reconsideration and on appeal, Point South contends that the promissory note is unrelated to the contract for the sale of property; thus, it cannot form an independent basis for the alleged contractual breach. However, Point South did not make these arguments prior to summary judgment. Point South states the promissory note was dated January 24, 2005, and the contract was dated January 25, 2005, which references a $100,000 "cash down payment" payable at closing. Thus, Point South argues that the contract modified the promissory note; therefore, the promissory note was not due until closing. Alternatively, Point South argues that if the contract did not modify the promissory note, then the note and the contract should *981 be viewed as stand-alone agreements, and the alleged breach of the note is of "no consequence" to the contract. Point South continues that the alleged breach of the promissory note, which was never referenced in the contract, cannot form the basis for the breach of the contract. Further, Point South argues that because the contract and the note are at the very least ambiguous, this is a question of fact which must be determined; thus, summary judgment was inappropriate.
¶ 41. We note at the outset that neither party pointed to any ambiguity or conflict in the terms of the contract and the promissory note prior to the grant of summary judgment. Again, it is the responsibility of the party opposed to summary judgment, in this case Point South, to "set forth specific facts showing that there are genuine issues for trial." See Massey, 867 So.2d at 238(¶ 6). Therefore, it is not the responsibility of the trial court to review the contractual documents and find ambiguity when the parties have raised no issue in that regard. Reviewing the record and the arguments as they existed at the time the chancery court granted summary judgment, we cannot find that the chancellor erred in concluding that Point South breached the contract by failing to pay the promissory note in accordance with its terms. Further, we find no abuse of the chancellor's discretion in refusing to grant reconsideration on this point when there is absolutely nothing in the record to indicate that the parties, in fact, ever considered the ambiguity to exist. We will, however, address briefly Point South's two proposed interpretations of the interplay between the promissory note and the contract.
¶ 42. First, as far as the contract modifying the promissory note because it was subsequently dated, the record reflects that the note and contract were returned via Federal Express on the same date; so they must be considered simultaneous documents and, therefore, must be read together. It is well established that since both documents were part of the same transaction, the note must be read in conjunction with the contract. See 11 Am. Jur.2d Bills and Notes § 131 ("[T]he terms of an instrument may be modified or affected by any other written agreement executed as part of the same transaction," and it is not necessary that the note and separate written agreement refer to each other for this to occur). Second, as to Point South's contention that the two documents should be considered as completely separate documents, this is contradictory to the language of the promissory note, which on its face states it is a non-refundable down payment on the contract. Further, Point South's counsel at the hearing on the motion for summary judgment said his client considered the note and contract were "one deal." Thus, we cannot find the trial court abused its discretion in refusing to allow new interpretations of the contract to prevent summary judgment.

5. Whether the chancery court relied upon improper evidence in granting summary judgment.
¶ 43. Finally, Point South argues, as it did on motion for reconsideration, that McDermott's affidavit is invalid on its face and the chancellor improperly relied upon it in granting summary judgment. Point South further contends that "[n]umerous other documents in the record attached as exhibits by the Sellers and relied upon by the trial court did not meet the requirements of Rule 56(e)" and, thus, were inappropriate to support summary judgment. Point South primarily challenges the McDermott affidavit as it failed to attach sworn or certified copies of the survey and *982 title commitment letter it referenced.[21] Point South further alleges the affidavit attaches an unauthenticated and inadmissible e-mail about the loan cancellation. Point South also scrutinizes the affidavit for several typographical errors.[22]
¶ 44. Point South may have identified minor errors and deficiencies in Sellers' affidavit, but the record indicates Point South neither made any motion to strike regarding the affidavits nor any objection to the sufficiency of Sellers' evidence under Mississippi Rule of Civil Procedure 56 prior to or at the hearing on the motion for summary judgment. While Point South did raise this issue in its motion for reconsideration, it never moved to strike the evidence. The supreme court has stated that "the non-moving party must be diligent in opposing the motion for summary judgment." Grisham v. John Q. Long V.F.W. Post No. 4057, Inc., 519 So.2d 413, 415 (Miss.1988) (citations omitted). It is well established that "[a] party must move to strike an affidavit that violates the rule, and if he fails to do so, he will waive his objection and, in the absence of `gross miscarriage of justice,' the Court may consider the defective affidavit." Bd. of Educ. of Calhoun County v. Warner, 853 So.2d 1159, 1163(¶ 16) (Miss.2003) (citation omitted). Thus, we find that the chancellor did not base his decision on improperly admitted evidence.

II. POINT SOUTH'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT OR, IN THE ALTERNATIVE, STAY THE PROCEEDINGS
¶ 45. After oral argument before this Court, the parties were granted several stays of the proceeding, beginning in July 2007 until April 7, 2008, in order to consummate settlement. On April 10, 2008, Point South then filed a motion to enforce the settlement agreement between it and Sellers, which was executed by the parties on February 12, 2008, or, in the alternative, a motion to stay the proceedings again. Point South's motion stated that in April 2005 Sellers had entered into a contract with Chris Ferrara, a potential purchaser, for the purchase of the property at issue and that Ferrara was obligated to close thirty days after the dismissal of this appeal and the release of the lis pendens. However, Point South stated it made numerous requests of Sellers and Ferrara to close their deal, but they never did. Therefore, Point South requested this Court to enforce the settlement agreement and require Sellers to close with Ferrera or, alternatively, stay all proceedings before this Court until Sellers are able to close on the sale of the property.
¶ 46. On April 30, 2008, Sellers responded to Point South's motion, stating that while it appeared the closing was imminent with Ferrara in February or March 2008, he inexplicably notified Sellers *983 on March 18, 2008, that he would not close on the property. Sellers claim that Point South was appropriately apprised of this development. They also deny any bad faith action such as attempting to avoid settlement with Point South through a covert agreement with Ferrara.
¶ 47. Finally, on July 24, 2008, Sellers supplemented their response to Point South's motion with a release from Ferrara and claimed that Point South's original motion is moot because the closing between Sellers and Ferrara, which was a condition precedent to the settlement agreement between Point South and Sellers, is now discharged.
¶ 48. The enforcement of the settlement agreement between Point South and Sellers was not raised in the trial court. As an appellate court, we have no original jurisdiction and can only examine "questions that have been tried and passed upon by the court from which the appeal is taken." Leverett v. State, 197 So.2d 889, 890 (Miss.1967) (citing Collins v. State, 173 Miss. 179, 180, 159 So. 865, 865 (1935)). Therefore, this Court's only authority over the settlement is our decision to stay our ruling in order to allow the parties to consummate their settlement. By separate order, we dismiss the motion without prejudice so that Point South can litigate this issue in an appropriate forum, if it so desires.

CONCLUSION
¶ 49. For the above reasons, we affirm the chancellor's finding that no genuine issue of material fact existed regarding Point South's specific performance claim; thus, Sellers are entitled to judgment as a matter of law. Further, we find no abuse of the chancellor's discretion in declining to grant Point South's motion for reconsideration.
¶ 50. THE JUDGMENT OF THE CHANCERY COURT OF HARRISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. IRVING, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. CHANDLER, J., NOT PARTICIPATING.
NOTES
[1] An explanation of the parties involved is as follows: Point South Land Trust is a trust organized under the laws of Florida; Dean Roffers is its trustee; Ramon Gutierrez is record title holder of the property at issue; Back Bay Casino of Biloxi, LLC is a company organized under Mississippi law which holds various state and federal permits necessary to establish a gaming operation on the property; and Bayview Gutierrez, LLC is a holding agent, organized under Mississippi law, which was created to take title of the property from Gutierrez and convey the property to a purchaser.
[2] The contract used for this multimillion dollar real estate transaction was a Mississippi Association of Realtors form contract "for the purchase of lots and land." The form contract did not reference the promissory note. However, both executed documents were returned to the real estate agent via Federal Express on the same day.
[3] These permits relate to the use of the property as a gaming site, and they include all necessary federal, state, county, city, U.S. Corps of Engineers, and Mississippi Department of Marine Resources permits.
[4] In their brief, Sellers explain that the subject property is comprised of several individual parcels which, when plotted together, did not align and close, thus leaving a "gore."
[5] During the motion for summary judgment hearing, Sellers' attorney mistakenly referred to the extension date as March 4, 2005. The chancellor noted the error at the summary judgment hearing. Whether the extension expired March 2 or March 4 makes no difference to the outcome of this appeal.
[6] The complaint, recognizing that the acreage had varied from 9.2 to 8.37 acres, demanded that Sellers be required to provide necessary documents to Point South and Lawyers Title in order that the sale could be consummated. The complaint alleged that three matters had either not been provided or had not been provided in a timely manner: (1) a certain corporate resolution requested in the contract (not provided until March 30, 2005); (2) documents from the City of Biloxi regarding item M of the attached Lawyers Title commitment (item M, in turn, required an amended resolution from the City of Biloxi concerning the vacation of a public street known as Fountain Lane); and (3) a special use permit required by the City of Biloxi. As to this last item, Point South averred that Sellers "must provide a warranty ... which survives the closing that provides for the assignment of the permits which has not yet been done."
[7] Counsel for Point South represented that he had placed the response to the motion for summary judgment in the mail on December 12, 2005, but evidently "it hadn't gotten here" as of the hearing. The stamped-file date and docket entry indicates it was not filed until December 21, 2005. Counsel for Point South apparently also faxed incomplete copies of one of the affidavits in response to the itemization of facts to counsel for Sellers on the day prior to the hearing; however, the response to the itemization of facts tendered at the hearing had affidavits attached that counsel for Sellers had never seen.
[8] Counsel stated: "Mr. Smith said during that time Mr. Moran and Seymour engineers did a survey that cured the problem, and I think the facts are that they tendered that survey that cured that problem to Lawyers Title Insurance Company, which was the title insurance company doing this transaction, not American Title."
[9] The chancellor did not specifically strike the response to the motion for summary judgment, and that pleading, along with its attachment, are a part of the record on appeal.
[10] The chancery court transferred Sellers' remaining counterclaims to the Circuit Court of Harrison County. Sellers later moved to dismiss those claims, which the circuit court granted. After Point South filed its motion for reconsideration of the summary judgment, the case was transferred back to the chancery court.
[11] Point South asserted for the first time on reconsideration that Sellers had an affirmative duty to convey clear, marketable, fee simple title in 9.2 acres to Point South and that Seller's failure to cure the defect constituted a material breach of contract.
[12] Point South noted that the January 28, 2005, correspondence from Schmidt, counsel for Point South, to McDermott referred to between thirteen and eighteen permits that were believed to be held by Sellers. Schmidt's letter had not, however, informed Sellers that acknowledgment of transferability had to be obtained from each of the governmental entities, but suggested a procedure by which "all the permits be transferred into escrow with the title company prior to closing to assure that they are readily transferable and assignable." Schmidt further stated that since the permits were acquired in the name of Back Bay Casino, LLC, Point South "might end up contemplating the assignment of the membership interest of the LLC...."
[13] As will be discussed subsequently, Point South also identified other alleged "evidentiary deficiencies" in Sellers' summary judgment documentation.
[14] We note that the first requirement in this title commitment was the execution and recordation, without intervening rights, of a warranty deed from Gutierrez to Bayview Gutierrez, LLC.
[15] ALTA stands for American Land Title Association.
[16] The record contains neither certification nor the requirements for ALTA certification. Point South invited the court to review the ALTA requirements from the ALTA website.
[17] Point South had first made this unacknowledged change in position in its Rebuttal in Support of Motion for Reconsideration, filed approximately two weeks before the hearing.
[18] Point South did not object on this basis in its motion for reconsideration.
[19] McDermott's affidavit stated: "to cure this discrepancy, a survey was performed by Moran & Seymour which was certified by the American Land Title Association." Point South claims there has been a "`conspicuous' silen[ce] concerning whether the gore was in fact cured by the survey."
[20] Since the Lawyers Title commitment reflects an updated effective date of March 16, 2005, we fail to see how the information regarding compromise could have not been provided until March 29.
[21] These arguments relate to the alleged title defect issue and curing of the gore. The copy of the First American title commitment was attached as a separate exhibit to the motion for summary judgment.
[22] While the affidavit is headed "Affidavit Michael B. McDermott," its opening paragraph states that "Ramon Gutierrez" appeared and was sworn by the notary. The affidavit, however, refers to Michael B. McDermott in two additional places, including his signature directly above the notary's certification. Second, the affidavit states that by the end of February 2005, all of the conditions set forth in "paragraph `A' to `D' section 11 of the contract were met and Sellers were ready, willing, and able to tender performance." Although these conditions are in paragraph 17, rather than section 11, of the contract, the affidavit still affirmatively stated that Sellers were ready to perform at the end of February 2005.