# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CA-01699-SCT

*MS CREDIT CENTER, INC., d/b/a MS LOAN CENTER, AMERICAN BANKERS LIFE ASSURANCE COMPANY OF FLORIDA  AND MS CASUALTY INSURANCE COMPANY*

*v.*

*CATHERINE HORTON*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/16/2004 |
| TRIAL JUDGE: | HON. RICHARD A. SMITH |
| COURT FROM WHICH APPEALED: | SUNFLOWER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | TAYLOR NICHOLSON FERRELL |
| | WALTER D. WILLSON |
| | KENNA L. MANSFIELD, JR. |
| ATTORNEY FOR APPELLEE: | SUZANNE GRIGGINS KEYS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 02/23/2006 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WALLER, P.J., DICKINSON AND RANDOLPH, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     This is an appeal of a trial judge's order denying a motion to compel arbitration. For reasons other than those cited by the trial judge, we affirm.

## BACKGROUND FACTS AND PROCEEDINGS

¶2.     Catherine Horton made three loans from MS Credit Center, Inc., d/b/a MS Loan Center ("MS Credit").[1]  The first was on January 28, 1997, for $553.73;[2] the second on July 12, 1999, for $626.49; and the third on December 21, 2001, for $961.88.  In her second loan transaction, Horton purchased credit life and disability insurance from MS Life Insurance Company ("MS Life") and MS Casualty Insurance Company ("MS Casualty").[3]  In the third transaction, Horton purchased credit life and disability insurance from American National Insurance Company and credit property insurance from American National Property and Casualty Company, neither of whom are parties to this suit.

¶3.     In connection with her 2001 loan, Horton signed a separate document entitled: "ARBITRATION AGREEMENT AND WAIVER OF JURY TRIAL."  The title was written in all capital, bold-face font, and the body of the agreement was written in the same font size used in the other loan documents.  The agreement stated, in part:

> ARBITRATION.  I agree with you to arbitrate any and all (1) disputes, torts, counterclaims, or any other matter in question or controversy between us arising out of, in connection with, or in any way relating to the loan transaction, including any Disclosure Statement, Promissory Note and Security Agreement and any insurance coverage you might purchase in connection with any transaction ("Claims") (including questions or whether a Claim must be arbitrated under this Agreement) and (2) any Claims arising out of, in

---

[1] The "MS" contained in the names of the defendants is not an abbreviated form of Mississippi.

[2] This amount was taken from the photocopy of the loan document and was difficult to discern. The amount is not stated in any other document, and thus, the amount may not be the exact amount of the January 1997 loan.

[3] MS Life and MS Casualty are referred to herein as the "Insurance Defendants."

2

connection with, or relating to a transaction involving us and one or more third parties who has not signed this Agreement which a third party elects to arbitrate, such as any insurer for any insurance policies you might elect to buy relating to this transaction ("Third Party Claims").

¶4. Also, at the end of the agreement, directly above the line prepared for Horton's signature, was the following language:

THE ARBITRATION WILL TAKE THE PLACE OF ANY COURT PROCEEDINGS, INCLUDING A TRIAL WITH A JUDGE AND JURY. I UNDERSTAND THAT I AM WAIVING ANY RIGHT TO A TRIAL BY A JUDGE OR A JUDGE AND JURY. THE ARBITRATOR MAY AWARD DAMAGES OR OTHER RELIEF ONLY TO EITHER OF US AND ANY THIRD PARTY THAT EXERCISES THEIR RIGHT TO ARBITRATE CLAIMS UNDER THIS AGREEMENT. IF I HAVE OTHER LOANS OR INSURANCE POLICIES THROUGH THE LENDER, THIS AGREEMENT APPLIES TO ALL OTHER TRANSACTIONS INVOLVING THIS LENDER.

I HAVE READ THIS AGREEMENT CAREFULLY. IT LIMITS CERTAIN OF MY RIGHTS, INCLUDING MY RIGHT TO MAINTAIN A COURT ACTION AND A TRIAL BY JURY. IF ANY PART OF THIS AGREEMENT IS FOUND TO BE IN CONFLICT WITH APPLICABLE LAW OR DECLARED INVALID, THAT WILL NOT AFFECT ANY OTHER PART OF THIS AGREEMENT AND THE REMAINING PORTIONS OF THIS AGREEMENT REMAIN VALID AND BINDING.

¶5. In addition to signing her name just below this language, Horton placed her initials on the bottom of the page containing the arbitration agreement.

¶6. On December 27, 2002, Horton filed suit against MS Credit and the Insurance Defendants, alleging they did not adequately disclose the terms of her purchases of credit insurance. Horton asserted causes of action for Breach of Fiduciary Duties, Breach of Implied Covenants of Good Faith and Fair Dealing, Fraudulent Misrepresentation and/or Omission, Negligent Misrepresentation and/or Omission, Civil Conspiracy, Negligence, and

3

Unconscionability. Horton demands statutory and compensatory damages of $1,000,000.00, punitive damages of $10,000,000.00, costs, attorneys' fees, and pre and post-judgment interest. Horton does not limit her unconscionability claim to the arbitration agreement. Rather she asserts that the entire set of loan transactions were procedurally and substantively unconscionable.

¶7. The defendants filed separate answers asserting numerous affirmative defenses. The Insurance Defendants asserted as their forty-eighth affirmative defense that "some or all of the claims advanced herein are subject to binding arbitration under the loan agreements and/or the Federal Arbitration Act." MS Credit did not include an arbitration defense in its original answer but did so in its July 7, 2003, answer to the Amended Complaint.[4]

¶8. The Insurance Defendants served discovery on Horton and noticed her deposition. MS Credit, Bankhead and Sloan neither served discovery upon Horton, nor noticed her deposition.

¶9. Horton testified in her deposition that each time she went to the MS Credit office to obtain a loan, she was presented the paperwork and told where to sign. Although she testified she did not know what the term "arbitration" meant, there is no evidence in the record that anyone at MS Credit provided incorrect or misleading information which induced Horton to enter the agreement. Bankhead testified that she customarily presented paperwork to borrowers for their review and signature, and only upon request did she attempt to explain the arbitration language.

---

[4] In her amended complaint, Horton added two individual defendants: Kathy Bankhead and David Sloan. Horton's claims against Bankhead and Sloan are not mentioned in the briefs.

4

¶10.    On March 16, 2004, MS Credit - joined by Bankhead and Sloan - filed a Motion to Compel Arbitration of Horton's claims.   The motion asserted that when Horton signed the arbitration agreement in connection with her December 2001 loan, she agreed to submit all claims to binding arbitration.   The Insurance Defendants joined in MS Credit's Motion and filed a separate motion to address their standing to compel arbitration.

¶11.    In response to MS Credit's Motion to Compel Arbitration, Horton asserted: (1) Defendants waived their rights to compel arbitration; (2) Horton did not knowingly and voluntarily agree to arbitrate; and (3) the arbitration agreement was procedurally unconscionable.

¶12.    On August 16, 2004, the trial court denied the motion to compel arbitration, specifically holding that the agreement was procedurally unconscionable and unenforceable. From this order MS Credit, MS Casualty, and MS Life appeal.

## ANALYSIS

¶13.    The question presented is whether the arbitration agreement between Horton and MS Credit require her to submit her claims to binding arbitration.   Although the record does not support the trial court's finding of unconscionability, we hold the defendants nevertheless waived the right to require arbitration.   Thus, the trial court reached the right result for the wrong reason.   Because we are reversing the trial court's finding of unconscionability, and because we announce today new guidelines for assertion of all affirmative defenses, we shall proceed to discuss the issues in some detail.

I.

*Federal Arbitration Act*

¶14.    When a commercial transaction involving interstate commerce includes an agreement to arbitrate disputes, federal law controls the enforcement of the arbitration agreement. ***Guiness-Harp Corp. v. Jos. Schlitz Brewing Co***., 613 F. 2d 468 (2nd Cir. 1980).  Federal law on the subject of arbitration is codified at 9 U.S.C. § 1, *et seq*.  This set of federal statutes is officially known as the Federal Arbitration Act ("FAA").   The FAA and the United States Supreme Court interpretive decisions, are the controlling law on the subject.

¶15.    When Congress enacted the FAA, its purposes were to establish a broad "federal policy favoring arbitration," and to require courts to "rigorously enforce agreements to arbitrate." ***East Ford v. Taylor***, 826 So.2d 709, 713 (Miss. 2002) (*citing **Shearson/Am. Exp. Inc. v. McMahon***, 482 U.S. 220, 226 (1987)).  Section 2 of the FAA provides, *inter alia*:

> A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*.

9 U.S.C. § 2 (emphasis added).


*Doctor's Associates, Inc. v. Casarotto*

¶16.    The United States Supreme Court – whose decisions the justices on this Court are bound by oath to follow – has clearly declared that Section 2 of the FAA prohibits courts (including this Court) from singling out arbitration provisions for special treatment.   That is to say, it prevents courts from placing more stringent requirements for the enforcement of

6

arbitration provisions than for other provisions in a contract. ***Doctor's Assoc., Inc. v. Casarotto***, 517 U.S. 681, 687 (1996).

¶17.   In ***Casarotto***, a Subway sandwich shop franchisee filed suit against his franchisor "alleging state-law contract and tort claims relating to the franchise agreement." ***Id***. at 683. The agreement included an arbitration provision in ordinary type on page nine. ***Id***.   The trial court stayed all proceedings pending arbitration as required by the agreement.   The Montana Supreme Court reversed, holding that the arbitration provision was unenforceable under a Montana statute which required contracts to include notice of arbitration provisions "in underlined capital letters on the first page of the contract." Mont. Code Ann § 27-5-114(4).

¶18.   The Supreme Court granted certiorari, vacated the Montana Supreme Court's judgment, and remanded for further consideration in light of ***Allied-Bruce Terminix Cos. v. Dobson***, 513 U.S. 265, 115 S. Ct. 834, 130 L. Ed. 2d 753 (1995), which held:

> States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of *any* contract." 9 U.S.C. § 2 (emphasis added). *What states may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal "footing," directly contrary to the Act's language and Congress's intent*.

513 U.S. at 281  (emphasis added).

¶19.   On remand, the Montana Supreme Court, declining further briefing or oral argument, refused to change its prior decision to reverse the trial court's stay and order of arbitration.

The United States Supreme Court again granted certiorari and this time, reversed. *Casarotto*, 517 U.S. at 686. Using exceptionally clear and precise language agreed upon by eight justices, the *Casarotto* Court again set forth the rule of law which we must follow:

> By enacting § 2, we have several times said, Congress *precluded states from singling out arbitration provisions for suspect status*, requiring instead that such provisions be placed "upon the same footing as other contracts." *Scherk v. Alberto-Culver Co*., 417 U.S. 506, 511, 94 S. Ct. 2449, 2453, 41 L. Ed. 2d 270 (1974) (internal quotation marks omitted). Montana's [statute] directly conflicts with § 2 of the FAA because the State's law conditions the enforceability of arbitration agreements on compliance with a special notice requirement not applicable to contracts generally. The FAA thus displaces the Montana statute with respect to arbitration agreements covered by the Act. See 2 I. Macneil, R. Speidel, T. Stipanowich, & G. Shell, Federal Arbitration Law § 19.1.1, pp. 19:4-19:5 (1995) (under *Southland* **and** *Perry*, "state legislation requiring greater information or choice in the making of agreements to arbitrate than in other contracts is preempted").

*Casarotto*, **Id.** at 687 (emphasis added). The Court further stated:

> The 'goals and policies' of the FAA, this Court's precedent indicates, are antithetical to *threshold limitations placed specifically and solely on arbitration provisions*. Section 2 "mandate[s] the enforcement of arbitration agreements," *Southland*, 465 U.S., at 10, 104 S. Ct., at 858, "save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U.S.C. § 2. [Montana's statute] places arbitration agreements in a class apart from "any contract," and singularly limits their validity. *The State's prescription is thus inconsonant with, and is therefore preempted by, the federal law*.

*Id*. at 688 (emphasis added).

¶20.   Moreover, this Court has stated that "we will respect the right of an individual or entity to agree in advance of a dispute to arbitration or other alternative dispute resolution." *Russell v. Performance Toyota, Inc*., 826 So.2d 719, 722 (Miss. 2002). Indeed, it is not a matter of discretion since our duty requires us to follow the law.

¶21.    Accordingly, all doubts concerning the scope of arbitrable issues, the construction of the contract language, and asserted defenses to arbitration must be resolved in favor of arbitration.  *See Taylor*, 826 So.2d at 713 (*citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24-25 (1983)).  Furthermore, this strong federal policy favoring arbitration places upon the party opposing arbitration the burden of establishing any alleged defense to the enforcement of the arbitration provision.  *American Heritage Life Ins. Co. v. Land*, 321 F.3d 533, 539 (5th Cir. 2003).

## II.

¶22.    In determining the applicability of the FAA, and whether its provisions require the parties in a particular case to arbitrate their claims, we conduct a two-prong inquiry.  *Taylor*, 826 So.2d at 713.  The first prong requires a threshold finding that the agreement to be arbitrated must have a nexus to interstate commerce, 9 U.S.C.A. § 2, followed by a finding that the dispute in question is arbitrable, that is, the terms of the arbitration agreement require the parties to arbitrate the kind of dispute involved in the litigation. *Id*  The second prong addresses whether legal constraints external to the agreement, such as fraud, duress, or unconscionability, foreclose arbitration of the claims.

 *Id.* at 713.

   *Interstate commerce*

¶23.    Language within the FAA includes the specific term "involving commerce."  However, the term "involving commerce" is viewed as equivalent to "affecting commerce," indicating

9

approval by the United States Supreme Court of Congress' broad Commerce Clause powers. *Dobson*, 513 U.S. at 273-74. Credit and lending agreements must comply with federal laws and regulations, including the federal Truth-in-Lending Act and the Federal Trade Commission "holder in due course" rule, which were created under Congress' Commerce Clause powers. *See McKenzie Check Advance of Miss., L.L.C. v. Hardy*, 866 So.2d 446, 450-51 (Miss. 2004). Therefore, it is clear the contracts involved in this dispute have a nexus to interstate commerce.

¶24. Furthermore, there is no dispute that Horton's claims against MS Credit and the Insurance Defendants fall within the matters covered by the arbitration agreement. Courts often characterize arbitration language as either broad or narrow. Broad arbitration language governs disputes "related to" or "connected with" a contract, and narrow arbitration language requires arbitration of disputes that directly "arise out of" a contract. *Pennzoil Exploration & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998).

¶25. Because broad arbitration language is capable of expansive reach, courts have held that "it is only necessary that the dispute 'touch' matters covered by [the contract] to be arbitrable." *Pennzoil*, 139 F.3d at 1068. *See Mississippi Fleet Card, L.L.C. v. Bilstate, Inc*., 175 F. Supp. 2d 894, 899 (S.D. Miss. 2001); *First Family Fin. Serv., Inc. v. Fairley*, 173 F. Supp. 2d 565, 570 (S.D. Miss. 2001); *Blount v. Nat'l Lending Corp*., 108 F. Supp. 2d 666, 669 (S.D. Miss. 2000); *Pridgen v. Green Tree Fin. Servicing Corp*., 88 F. Supp. 2d 655, 657 (S.D. Miss.

2000). The arbitration agreement between Horton and MS Credit contains the following undisputedly broad language:

> I agree with you to arbitrate *any and all* (1) disputes, torts, counterclaims, or any other matter in question or controversy between us *arising out of, in connection with, or in any way relating to* the loan transaction, including any Disclosure Statement, Promissory Note and Security Agreement *and any insurance coverage* you might purchase in connection with any transaction ("Claims") (including questions or whether a Claim must be arbitrated under this Agreement) and (2) any Claims *arising out of, in connection with, or relating to a transaction involving us and one or more third parties* who has not signed this Agreement which a third party elects to arbitrate, such as any insurer for any insurance policies you might elect to buy relating to this transaction ("Third Party Claims").

(emphasis added). *See* **Pennzoil**, 139 F.3d at 1067 (arbitration provisions using terms "arising out of" and "in connection with or relating to" are classified as broad provisions).

¶26. Each of Horton's claims against the defendants either arise out of or relate to loan transactions with MS Credit, and the arbitration provision provides that all claims arising out of or relating to "a transaction involving us and one or more third parties" are subject to arbitration. Therefore, the arbitration agreement applies to all of Horton's claims because the loan and insurance transactions involved here affect interstate commerce, and the claims are included within those to be arbitrated; the first prong of the inquiry under the FAA is satisfied.

¶27. **Taylor's** or the second prong of analysis requires us to consider whether legal constraints external to the parties' agreement foreclose arbitration of the claims. **Taylor**, 826 So.2d at 713. The evidence is clear in this case that both Horton and MS Credit signed the

arbitration agreement. Horton's assertion that she did not knowingly and voluntarily agree to the terms of the arbitration agreement are averments of procedural unconscionability.

¶28. Horton bases her assertion of procedural unconscionability on four claims: (1) she did not have knowledge of the arbitration agreement; (2) the arbitration provision was not explained to her or otherwise brought to her attention; (3) she did not voluntarily agree to the arbitration agreement, as it was a contract of adhesion; and (4) the arbitration agreement was not understandable and could not be explained by MS Credit's employee. The trial court agreed with Horton and held the agreement was procedurally unconscionable.

*Unconscionability*

¶29. This Court has defined unconscionability as "an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to the other party." ***Taylor***, 826 So.2d at 715 (*quoting* ***Entergy Miss., Inc. v. Burdette Gin Co.***, 726 So.2d 1202 (Miss. 1998)). A plaintiff may assert both procedural and substantive unconscionability claims. Courts have held agreements to be substantively unconscionable where they are "one-sided [and] one party is deprived of all the benefits of the agreement or left without a remedy for [the other] party's nonperformance or breach, a large disparity between cost and price or a price far in excess of that prevailing in the market price [exists], or [the] terms bear no reasonable relationship to business risks assumed by the parties." ***Bank of Indiana, Nat'l Ass'n v. Holyfield***, 476 F. Supp. 104, 110 (S.D. Miss 1979) (citations omitted). Procedural unconscionability can be proven by showing "a lack of knowledge, lack of voluntariness, inconspicuous print, the use of complex legalistic language, disparity in

12

sophistication or bargaining power of the parties and/or a lack of opportunity to study the contract and inquire about the contract terms." *Taylor*, 826 So.2d at 714 (*citing Pridgen*, 88 F. Supp. 2d at 655).

*Procedural Unconscionability*

¶30. Factors considered by this Court[5] in finding arbitration provisions procedurally unconscionable are: 1) lack of knowledge; 2) lack of voluntariness; 3) inconspicuous print; 4) complex legalistic language; 5) disparity in sophistication or bargaining power; 6) lack of opportunity to study the contract and inquire about the contract terms. *Id.* We now proceed to examine each of these factors as applied to the record before us.

1. Lack of Knowledge

¶31. Horton alleges that, because the arbitration agreement was not explained to her and not brought to her attention, she neither understood arbitration nor knew of its presence in her documentation. Under Mississippi law, however, parties to a contract have an inherent duty to read the terms of a contract prior to signing; that is, a party may neither neglect to become familiar with the terms and conditions and then later complain of lack of knowledge, nor avoid a written contract merely because he or she failed to read it or have someone else read and

_____

[5]As discussed *supra*, Section 2 of the FAA requires that any analysis approved by this Court for detection of procedural unconscionability of arbitration provisions must be equally applied to all contractual provisions.

13

explain it. ***Titan Indem. Co. v. City of Brandon, Miss.***, 27 F. Supp. 2d 693, 697 (Miss. 1997). Horton may not escape the agreement by simply stating she did not read the agreement or understand its terms.

¶32.    Horton also alleges that because the arbitration agreement was not explained to her, she did not have proper knowledge of the legal effect of the agreement.   However, this Court has never held that one party to an arm's-length contract has an inherent duty to explain its terms to the other.    Duties to disclose or to act affirmatively, such as explaining the terms of a contract, do not arise in arm's length transactions or under an ordinary standard of care. Rather they arise only in fiduciary or confidential relationships.   ***Van Zandt v. Van Zandt***, 86 So.2d 466 (Miss. 1956).   Consequently, Defendants in this case had no affirmative duty to disclose, explain, or affirmatively act on behalf of Horton, and she cannot attribute her lack of knowledge to Defendant's failure to explain.

### 2. Lack of Voluntariness

¶33.    Horton further says that, because the arbitration agreement was a contract of adhesion, she did not voluntarily agree to its terms.    After careful review of the record, we find no evidence supporting this contention.    "A contract of adhesion has been described as one that is 'drafted unilaterally by the dominant party and then presented on a "take-it-or-leave-it" basis as to the weaker party who has no real opportunity to bargain about the terms.'" ***Taylor***, 826 So.2d at 716 (*quoting* ***Holyfield***, 476 F. Supp. at 108). Bankhead, the employee who conducted

14

the December 21, 2001, loan transaction with Horton, testified that the arbitration agreement was a negotiable term of the loan transaction and could have been removed upon request. Horton did not testify to the contrary. Also, because the arbitration agreement was separate from other documentation, it could easily have been omitted from the loan transaction. There is no evidence to suggest Horton requested removal of the arbitration agreement or negotiation of any of the terms of the loan transaction. Therefore, Horton has failed to establish that she did not voluntarily enter the arbitration agreement.

### 3. Inconspicuous Print

¶34. Horton also claims the arbitration agreement was "buried" with other loan papers and could not have been noticed unless it was "brought to one's attention." However, the record indicates the arbitration agreement was printed on a separate page using the same size font as the other loan documents. Furthermore, the title to the agreement – printed in bold font and all-capital letters – was: "**ARBITRATION AGREEMENT AND WAIVER OF RIGHT TO TRIAL BY JURY**." Thus, the arbitration agreement signed by Horton was at least as open and obvious as other contractual provisions, fulfilling the requirements set forth in *Casarotto*, beyond which we may not constitutionally travel.

### 4. Complex Legalistic Language

¶35. The trial court concluded that the arbitration agreement was unconscionable due, in part, to "complex legalistic language."[6] However, Horton cites no authority which suggests that

---

[6]Horton's counsel urged us at oral argument to adopt a new pro-consumer rule which would require all consumer contracts to be easily understood by the parties. Even were it possible to pen such

15

contractual provisions are unenforceable simply because they are difficult for a lay person to understand. That said, we note that the arbitration language in Horton's agreement clearly states that the parties agreed to arbitrate any and all disputes arising out of, or in any way related to, the loan transaction at issue, including any and all claims premised upon any insurance policies purchased in connection therewith. The agreement further states that "arbitration will take the place of any court proceedings, including a trial with a judge or a judge and a jury." Horton's agreement provides that she understood she was "waiving any right to a trial by a judge or a judge and jury." We see nothing difficult or misleading about this language. The arbitration agreement is not unconscionable because of complex or legalistic language.

### 5. Disparity in Sophistication or Bargaining Power

¶36. Horton's claim that there was a lack of sophistication or bargaining power is not supported by any evidence, sworn testimony, or affidavits. Rather, she merely states that she was "certainly less sophisticated in business matters." Even if this contention is correct, it is certainly not enough, standing alone. This Court could hardly employ a rule which required the parties to every contract to be of exactly equal sophistication. One party or the other will always be more or less sophisticated in business matters than the other. Here, however, there

---

a rule, the resulting ambiguity and imprecise terms would potentially present far worse problems than are caused by carefully drafted language. Additionally, such decisions are constitutionally reserved to the Legislature.

16

is no evidence in the record that Horton attempted to negotiate the terms of the arbitration agreement or have it removed. Nor does the record reflect Horton's alleged lack of sophistication in financial matters. Nothing in the record indicates Horton could not have obtained a loan with another financial institution, had she so desired. Thus, Horton has failed to demonstrate lack of sophistication sufficient to render the arbitration agreement unenforceable.

6. Lack of Opportunity to Study and Inquire About Contract Terms

¶37. The record provides no specific facts supporting Horton's alleged lack of opportunity to study and inquire about the contract terms. There is no indication she was rushed or hurried into completing the loan transaction by a set time; nor can we find she was prevented from studying and inquiring as to the terms. Accordingly, this Court does not find any lack of opportunity to study and inquire about the contract terms.

*Substantive Unconscionability*

¶38. Horton vaguely averred to the lower court that the arbitration agreement was substantively unconscionable because it denied her remedies to which she was entitled under the law. However, the arbitration agreement between Horton and Defendants contains no limitation of damages, no limitation on bringing claims, and no waiver of liability. The agreement merely submits the question of liability to a forum other than the courts. *See Taylor*, 826 So.2d at 716. Thus, Horton has failed to establish that the arbitration agreement is substantively unconscionable.

III.

¶39.    Horton also raises the issue of waiver.  While the trial court made no specific findings regarding waiver, Horton nevertheless alleges in her brief that Defendants waived their right to compel arbitration.   This Court has stated that the "waiver of arbitration is not a favored finding, and there is a presumption against it." *Russell v. Performance Toyota, Inc.*, 826 So.2d 719, 724 (Miss. 2002) (*quoting* *Miller Brewing Co. v. Fort Worth Distrib. Co.*, 781 F.2d 494, 497 (5th Cir. 1986)).  Nevertheless, this Court has also held that arbitration can be waived where a party "actively participates in a lawsuit or takes other action inconsistent with the right to arbitration." *Cox v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 619 So.2d 908, 913-14 (Miss. 1993).  We have also said arbitration may be waived where a party "substantially invokes the judicial process to the detriment or prejudice of the other party." *Univ. Nursing Assocs., PLLC v. Phillips*, 842 So.2d 1270, 1278 (Miss. 2003).

¶40.    This Court has found waiver of the right to compel arbitration in only a limited number of cases. In *Cox*, we found the right to arbitration waived due to "extensive" pre-trial litigation, where the party seeking to enforce arbitration had filed a "summary judgment motion, requested two continuances, appealed to this Court based on a pre-trial ruling, and had requested various types of discovery." *Cox*, 619 So.2d at 914.   Also, in *Sanderson Farms v. Gatlin*, 848 So.2d 828, 838 (Miss. 2003), Sanderson Farms refused to pay one-half of the arbitration costs, thereby waiving arbitration.  Finally, in *Pass Termite and Pest Control v. Walker*, 904 So.2d 1030, 1035 (Miss. 2004), this Court found waiver where the movant

18

delayed for 237 days before moving to compel arbitration, failed to raise the defense of arbitration in the initial pleading, requested a jury trial in its answer, and thereafter proceeded with discovery.

¶41. The record before us today clearly demonstrates that the Defendants asserted their right to compel arbitration in their respective answers. However, rather than proceeding within a reasonable time to file a motion to compel arbitration and request a hearing on the motion, defendants proceeded to substantially engage the litigation process by consenting to a scheduling order, engaging in written discovery, and conducting Horton's deposition. Horton asserts that this participation in the lawsuit constituted a waiver of the Defendants' right to compel arbitration. Although participation in the litigation is an important factor to be considered, more is required to constitute a waiver. Horton also asserts that Defendants waived the right to compel arbitration by their unreasonable delay in bringing the issue before the trial court for adjudication. We find that, ordinarily, neither delay in pursuing the right to compel arbitration nor participation in the judicial process, standing alone, will constitute a waiver. That is to say, a party who invokes the right to compel arbitration and pursues that right will not ordinarily waive the right simply because of involvement in the litigation process, and a party who seeks to compel arbitration after a long delay will not ordinarily be found to have waived the right where there has been no participation in, or advancement of, the litigation process.

¶42. However, where – as here – there is a substantial and unreasonable delay in pursuing the right, coupled with active participation in the litigation process, we will not hesitate to find a waiver of the right to compel arbitration.[7]

¶43. The amended complaint was filed on May 5, 2003. The Insurance Defendants filed their answers to the amended complaint on May 23, 2003, and MS Credit filed its answer to the amended complaint on July 7, 2003. The Defendants did not file a motion to compel arbitration or otherwise pursue their right to arbitrate until March 22, 2004, a delay of eight months, all the while participating in the litigation process. Defendants have provided no plausible explanation for this delay.

¶44. Our holding today is not limited to assertion of the right to compel arbitration. A defendant's failure to timely and reasonably raise and pursue the enforcement of any affirmative defense or other affirmative matter or right which would serve to terminate or stay[8] the litigation, coupled with active participation in the litigation process, will ordinarily serve as a waiver. Our pronouncement today complies with the requirements of the FAA, as interpreted by the United States Supreme Court, that agreements to arbitrate may not be singled out or treated differently from other contractual provisions. *See* discussion of

---

[7]We have also held that prejudice to the party resisting arbitration is a factor to be considered. *See* ***Russell v. Performance Toyota, Inc.,*** 826 So. 2d 719, 724 (Miss. 2002) (*citing* ***Cox v. Howard, Weil, Labouisse, Friedrichs, Inc.***, 619 So. 2d 908, 911 (Miss. 1993)).

[8]Where a motion to compel arbitration is granted, the litigation does not terminate, but rather is stayed pending completion of the arbitration process and entry of the arbitrator's decision.

*Casarotto* supra. The issue of waiver of the right to compel arbitration must be carefully examined by the trial court the same as waiver of any other important right.

¶45. In this case, the defendants delayed pursuing their right to compel arbitration for eight months (over 240 days). We decline today to set a minimum number of days which will constitute unreasonable delay in every case, but rather we defer such findings for the trial court on a case by case basis. We do hold however that– absent extreme and unusual circumstances – an eight month unjustified delay in the assertion and pursuit of any affirmative defense or other right which, if timely pursued, could serve to terminate the litigation,[9] coupled with active participation in the litigation process, constitutes waiver as a matter of law.

## CONCLUSION

¶46. For the reasons stated, we affirm the circuit court's denial of the Defendants' Motion to Compel Arbitration. We find that, while the arbitration agreement was valid and enforceable, Defendants waived their right to compel arbitration. Therefore, we reverse and render the circuit court's finding that the arbitration agreement was procedurally unconscionable, but affirm the circuit court's denial of Defendant's Motion to Compel Arbitration.

---

[9]To pursue an affirmative defense or other such rights, a party need only assert it in a pleading, bring it to the court's attention by motion, and request a hearing. Once a hearing is requested, any delay by the trial court in holding the hearing would not constitute a waiver.

21

¶47.   **AFFIRMED.**

**SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, CARLSON AND RANDOLPH, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. DIAZ, J., NOT PARTICIPATING.**