# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01280-COA

**ALMA J. YOUNG, ET AL.**                                        **APPELLANTS**

**v.**

**FREESE & GOSS PLLC, RICHARD A. FREESE,**                **APPELLEES**
**TIM GOSS, SHEILA M. BOSSIER, BOSSIER**
**AND ASSOCIATES PLLC, AND SWEET AND**
**FREESE PLLC**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/28/2020 |
| TRIAL JUDGE: | HON. TOMIKA HARRIS IRVING |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | CHUCK McRAE |
| | ANNETTE BULGER MATHIS |
| ATTORNEYS FOR APPELLEES: | CHRISTOPHER DANIEL MEYER |
| | JOSHUA WAYNE STOVER |
| | RICHARD ARTHUR FREESE |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 08/23/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1. On April 28, 2020, Copiah County Circuit Court entered an order granting in part a motion to compel arbitration filed by Freese & Goss PLLC, Richard A. Freese, Dennis C. Sweet III, Tim Goss, Sheila M. Bossier, Bossier and Associates PLLC, Sweet and Freese PLLC, and Dennis C. Sweet III d/b/a Sweet and Associates PLLC (referred to collectively as Attorneys),[1] in a case initiated by their former clients (referred to collectively as

---

[1] Dennis C. Sweet III and Dennis C. Sweet III PLLC d/b/a Sweet and Associates PLLC were dismissed as parties to this appeal on January 20, 2022.

Claimants) whom they represented in a mass tort litigation stemming from the Claimants' alleged exposure to a toxic chemical called polychlorinated biphenyls (PCB). On October 28, 2020, the circuit court entered an order denying the Claimants' motion to reconsider. Aggrieved by the circuit court's ruling, certain Claimants appealed.[2]

## FACTS AND PROCEDURAL HISTORY

### I. Underlying PCB Litigation

¶2. Between 2005 and 2008 the Attorneys signed up potential claimants affected by PCB contamination from a manufacturing facility in Crystal Springs, Copiah County, Mississippi. Additionally, there were attorneys and law firms, aside from the parties involved in this appeal, that were actively interviewing and signing up clients to add to the claimant group. On February 28, 2006, one such attorney Don Mitchell entered into a written "Joint Venture and Representation Agreement" with Sweet and Freese PLLC (Sweet & Freese) regarding the PCB claims, as Sweet & Freese had the expertise and resources that Mitchell lacked to effectively prosecute the cases.[3] Ultimately Mitchell signed up approximately 3,000 clients

---

[2] The appellants in this case are listed on an attachment to the Appearance Form filed by their attorney, Chuck McRae, which is available on the Appellate Court's General Docket. Appearance Form, No. 2020-CA-01280-COA (Nov. 24, 2020), *available at* https://courts.ms.gov.

[3] There were additional joint venture agreements entered into prior to the February 28, 2006 agreement between Mitchell and Sweet & Freese. Other lawyers and firms involved in signing and litigating on behalf of the Claimants were Freese & Goss PLLC, Richard A. Freese, Tim K. Goss, Sheila M. Bossier, and Bossier and Associates PLLC, all of whom are parties of this appeal. Additionally, between 2005 and 2008, some of the law firms involved in the pre-litigation process as well as active litigation were dissolved, and others were merged.

to add to the mass tort litigation.[4] The contingency fee contracts that the clients signed during this pre-litigation process did not contain an arbitration provision.

¶3. During the vetting process for PCB claims, each potential claimant was initially tested, at the Attorneys' expense, to determine if the claimant's blood was positive for the presence of PCB toxins. However, many of the potential claimants did not appear to have viable claims after testing negative, and the testing was becoming cost prohibitive for the Attorneys. As a result, on February 28, 2008, the Attorneys began sending out letters to the potential claimants who either had negative blood tests or who lacked proof of exposure and could not pay for their own blood tests. The letters advised this group of potential claimants that the Attorneys had decided to not pursue their claims, released these persons from the retainer agreements they had entered with the Attorneys, and encouraged them to seek other counsel if they wished to pursue their potential claims. After the letters were sent, the Attorneys shifted their focus to the remaining 348 claimants who later became known as the "filed claimants." The Attorneys initiated a total of three lawsuits on behalf of the "filed claimants."[5] The complaints were filed against Kuhlman Corporation (Kuhlman), Kuhlman

---

[4] Approximately 1,000 additional potential PCB claimants were signed up by the McHugh Fuller Law Group PLLC (McHugh Firm). The McHugh Firm claimants were signed up under the February 28, 2006 joint venture agreement between Mitchell and Sweet & Freese.

[5] *James Alford et al. v. Kuhlman Corporation et al.*, No. 3:07-cv-00756-HTW-LRA, initiated on December 7, 2007, in the United States District Court for the Southern District of Mississippi. *Percy Alexander et al. v. Kuhlman Corporation et al.*, No. 2008-cv-00311, initiated on August 7, 2008, in the Circuit Court of Copiah County, Mississippi. Finally, *Dexter Allen et al. v. Kuhlman Corporation et al.*, No. 2008-cv-00312, initiated on August 7, 2008, in the Circuit Court of Copiah County, Mississippi.

Electric Corporation (KEC), BorgWarner Corporation (BorgWarner), and Dickinson Wright PLLC (Dickinson Wright).

¶4.     In March 2010, during mediation of the pending litigation, BorgWarner conditioned any settlement upon the execution and receipt of releases from all potential claimants. This condition included those potential claimants the Attorneys previously released. In March, 2010, the Attorneys and BorgWarner reached a tentative settlement agreement for BorgWarner to pay $28,000,000. However, the settlement was conditioned upon the execution of releases by all 3,000 plus potential claimants. In response to the contingency BorgWarner required, the Attorneys began to re-sign many of their previously released clients, as well as additional new potential claimants. Mitchell sent letters to the former clients explaining the possibility of settlement and the necessity of executing the new retainer agreement ("second retainer") and HIPAA form. Ultimately, approximately 3,000 previously released clients and new claimants signed the second retainer with Mitchell and Freese & Goss. While there was no lawsuit filed on behalf of these new claimants, they did reach a settlement with BorgWarner and are referred to as the "unfiled clients." The second retainers the unfiled clients signed contained an arbitration agreement that the first retainer did not include. The second retainer also included a provision that increased the attorney fees from forty percent, as provided in the first retainer, to forty-five percent of any amount recovered if the case was settled prior to trial.

¶5.     On July 30, 2010, the parties entered into a confidential master settlement agreement. While there is a dispute as to whether the amounts disbursed to the Claimants was the amount

4

that each person was entitled to receive, money was disbursed to the Claimants later in 2010 and early in 2011.

## II. Claimant/Attorney Litigation

¶6. On July 24, 2013, 288 individuals, including the Claimants in this appeal, filed their original complaint against the Attorneys with claims arising out of certain actions the Attorneys took during the course of their representation of the Claimants in the PCB litigation. The complaint was filed in the Circuit Court of Copiah County, Mississippi. On October 21, 2013, the Claimants filed an amended complaint alleging (1) "breach of fiduciary duties"; (2) "conversion"; (3) "tort of outrage/breach of attorney-client contract"; (4) "civil conspiracy/conspiracy to defraud and induce"; (5) "reckless and fraudulent inducement"; (6) "concealment"; (7) "wrongful conversion"; (8) "tortious interference with the original attorney contract"; (9) "reckless indifference"; (10) "unjust enrichment"; (11) "bad faith"; and (12) a claim for "injunctive relief."

¶7. On November 26, 2013, the Attorneys removed the case to federal court. While in federal court, the Attorneys filed a motion to dismiss and compel arbitration based upon the arbitration provision contained in the Claimants' second retainers. On October 20, 2014, the case was remanded back to the Copiah County Circuit Court.

¶8. In response to discovery actions noticed by the Claimants, on January 21, 2015, the Attorneys filed a motion to quash and for a protective order. On January 30, 2015, the Claimants filed a motion seeking, among other things, the recusal of Judge Pickard, who was the presiding judge in the case and the only circuit judge in the district. On February 5, 2015,

5

the Claimants noticed their recusal motion for a hearing on March 16, 2015. On January 30 and February 17, 2015, the Attorneys filed additional motions to quash certain discovery efforts by the Claimants. In the February 17 motion, the Attorneys asked that all discovery be stayed until after the court's ruling on the Attorneys' motion to dismiss and compel arbitration.[6] On February 19, 2015, an "Order Granting Defendants' Emergency Motion for Protective Order" was entered. In this order, the circuit court ruled that "**no discovery shall take place in this case until such time as the Court has conducted a hearing on Plaintiffs' Motion for Recusal and Defendants' Motion to Dismiss and Compel Arbitration.**" (Emphasis added).

¶9. The Attorneys filed a renewed motion to dismiss and compel arbitration or, in the alternative, a motion to sever on February 20, 2015. The Claimants filed a response and memorandum in opposition to the Attorneys' motion on March 10, 2015. The circuit court heard oral arguments on the motion to recuse on March 16, 2015.[7] On May 27, 2015, the circuit court denied the motion to recuse and noted, in the order, that the hearing on the motion to compel arbitration had been continued until after the court's ruling on the recusal motion.

¶10. The Attorneys filed their reply to the Claimants' response to the motion to compel arbitration on June 22, 2015. The Claimants pursued other discovery in 2015, and the Attorneys filed motions to stay the Claimants' discovery requests until after the motion to

---

[6] The first motion to compel arbitration was filed by the Attorneys on December 9, 2013, in federal court before the case was remanded on October 20, 2014.

[7] There is no transcript of this hearing in the appellate record.

6

compel was heard and decided. Other than the withdrawal of two attorneys for the Claimants, no actions of record were taken by either party in 2016 and 2017.[8]

¶11.　On August 2, 2018, the Attorneys noticed their motion to compel arbitration for a hearing on September 17, 2018. On August 31, 2018, the hearing was re-noticed for November 13, 2018. On October 11, 2018, the Claimants filed a new motion for Judge Pickard to recuse. There is nothing in the record to show that either of these motions were heard or decided by Judge Pickard.[9]

¶12.　On February 28, 2020, a notice was filed setting the motion to compel arbitration for a hearing on Monday, April 20, 2020. The Claimants filed a supplement to their original response in opposition of the motion three days prior to the hearing, on Friday, April 17, 2020. At the hearing, the circuit court heard arguments in support of and in opposition to the motion to compel arbitration. At the conclusion of the hearing, the circuit court gave the Attorneys ten days to file a reply to the Claimants' supplemental pleading filed on April 17. On April 28, 2020, the circuit court granted the motion to dismiss and compel arbitration as to all Claimants whose contracts contained an arbitration clause, and the court denied the motion to dismiss and compel arbitration as to all Claimants whose contracts did not have an arbitration clause. Further, the circuit court granted the motion to sever as to all Claimants whose contract did not contain an arbitration provision. The Claimants filed a motion to

---

[8] It should be noted that all discovery apparently was still stayed as a result of the February 19, 2015 order because the motion to compel arbitration had not been heard and decided.

[9] In the election conducted on November 10, 2018, Judge Tomika Irving was elected as circuit judge, effective in January 2019.

reconsider on May 6, 2020, which the court denied on October 28, 2020. Certain Claimants filed their notice of appeal on November 18, 2020.

## STANDARD OF REVIEW

¶13. "In reviewing an appeal of an order compelling arbitration, we review the trial judge's factual findings under an abuse-of-discretion standard, and we conduct a de novo review of all legal conclusions." *Virgil v. Sw. Miss. Elec. Power Ass'n*, 296 So. 3d 53, 59 (¶11) (Miss. 2020).

## ANALYSIS

¶14. The Claimants raise five issues on appeal, which we will address separately below.

> **I.   Whether the circuit court erred in ruling that the Attorneys did not waive and abandon their motion to compel arbitration because the Attorneys delayed bringing their motion on for hearing for more than five years and actively participated in the litigation.**

¶15. The Claimants' waiver argument is two-pronged. They assert that the Attorneys not only waived arbitration by waiting approximately five years to proceed with their motion to compel arbitration, but the Claimants also argue that the Attorneys waived arbitration by actively participating in the litigation.

¶16. "When a commercial transaction involving interstate commerce includes an agreement to arbitrate disputes, federal law controls the enforcement of the arbitration agreement." *MS Credit Ctr. Inc. v. Horton*, 926 So. 2d 167, 173 (¶14) (Miss. 2006). The controlling federal law is known as the Federal Arbitration Act (FAA), 9 U.S.C. § 1. "When Congress enacted the FAA, its purposes were to establish a broad 'federal policy favoring arbitration,' and to require courts to 'rigorously enforce agreements to arbitrate.'" *Id*. at (¶15). "[W]hen the

8

party seeking arbitration has included a demand for arbitration in its [response to a pleading], . . . the burden . . . then falls even more heavily on the party seeking to prove waiver." *Univ. Nursing Assocs. PLLC v. Phillips*, 842 So. 2d 1270, 1276 (¶17) (Miss. 2003). This Court has defined waiver as "the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right." *Charter Oak Fire Ins. Co. v. B.J. Enters. of Miss. LLC*, 156 So. 3d 357, 361 (¶18) (Miss. Ct. App. 2014) (citing *Bellemere v. Geico Gen. Ins. Co.*, 977 So. 2d 363, 369 (¶12) (Miss. Ct. App. 2007)). Further, the Mississippi Supreme Court has held that arbitration can be waived where a party "actively participates in a lawsuit or takes other action inconsistent with the right to arbitration." *Cox v. Howard, Weil, Labouisse, Friedrichs Inc.*, 619 So. 2d 908, 913-14 (Miss. 1993). Arbitration may also be waived when a party "substantially invokes the judicial process . . . ." *Univ. Nursing Assocs.*, 842 So. 2d at 1278 (¶28).

¶17. The Attorneys removed the case to federal court approximately three months after the Claimants filed their original complaint and approximately one month after the amended complaint was filed. While in federal court, the Attorneys filed their first motion to compel arbitration. Further, the Attorneys filed a renewed motion to compel arbitration after the case was remanded back to circuit court. By virtue of filing not one but two motions to compel arbitration, it is clear to this Court that the Attorneys fully intended to, and did in fact, assert their right to arbitrate from the time that the lawsuit was initiated.

¶18. While there was a substantial time lapse between the filing of the Attorneys' motion to compel and the date of the hearing, it is important to consider other actions and related

9

litigation that were taking place during that time. Most notably, there were multiple other cases in various stages of litigation, also filed by the Claimants' attorneys, which involved many of the same parties and arose out of the same set of facts. While some of those cases involved fee disputes between the various PCB attorneys, the remainder of those cases involved other PCB clients. The record in this appeal reveals that depositions and discovery were taking place, simultaneously, in those related cases.

¶19. The record shows that the Attorneys did not participate in discovery or otherwise invoke the judicial process *in this case*, so as to waive their right to arbitration. The Claimants argue that "the parties, through their attorneys, had agreed that all the depositions and discovery taken in the nine other related cases filed by Plaintiff's counsel may be used in this case or any other related case." However, the record in this case contains no proof of any such agreement between counsel. Further, the Claimants argue that the language in the Attorneys' objections, motions to quash, and motions for protective orders are consistent with their agreement. As such, the Claimants assert that the Attorneys have participated in the discovery process and have waived the right to compel arbitration as a result of their active participation in furtherance of litigation. Regardless of the language used in the Attorneys' objection, it is clear that the Attorneys were objecting to the various subpoenas and depositions. Notably, the Attorneys did not notice any depositions or propound any written discovery in the case at hand. The Attorneys acknowledge their presence at Edwrick Wilson's deposition, which was noticed by the Claimants' attorney. In any event, with the issue of arbitration still uncertain and motions to stay discovery still pending, the transcript

10

shows that an attorney did appear at, but did not participate in, the deposition.

¶20.    In *Williams v. Cigna*, 56 F.3d 656, 661 (5th Cir. 1995), Cigna removed an action to federal court, filed a motion to dismiss, filed a motion to stay proceedings, answered the Plaintiff's complaint, asserted a counterclaim, and exchanged discovery.  Despite all of Cigna's actions, the court held that "Cigna did not 'substantially invoke the judicial process' and waive its right to seek arbitration." *Id.*  at 662.  In *MS Credit Center Inc.*, 926 So. 2d at 180 (¶41), the Mississippi Supreme Court stated:

> We find that, ordinarily, neither delay in pursuing the right to compel arbitration nor participation in the judicial process, standing alone, will constitute a waiver.  That is to say, a party who invokes the right to compel arbitration and pursues that right will not ordinarily waive the right simply because of involvement in the litigation process, and **a party who seeks to compel arbitration after a long delay will not ordinarily be found to have waived the right where there has been no participation in, or advancement of, the litigation process.**

(Emphasis added).

¶21.    In the present case, the Attorneys first filed a timely motion to compel arbitration, after the case had been removed to federal court.  Once the case was remanded to circuit court on October 20, 2014, the Attorneys made efforts to have that motion heard and then filed a renewed motion to compel arbitration in the circuit court on February 20, 2015.  By order of the circuit court, all discovery in this case was stayed until the circuit court ruled on the Claimants' motion for recusal and the motion to compel arbitration.  After the court ruled on the first motion to recuse, neither party set the motion to compel for a hearing or moved to lift the stay on discovery.  Ongoing litigation in other related cases continued during this period of time.  Later, when the Attorneys set the motion to compel arbitration for a hearing,

11

the Claimants again filed a motion for the circuit judge to be recused. Immediately thereafter, before the motion to recuse could be heard, the sitting circuit judge was defeated in the general election, and a new circuit judge took over the case two months later. Based upon *MS Credit Center Inc.*, even though the motion was not heard by the trial court for several years after it was filed, the Attorneys did not waive their right to arbitration because they did not "participate in or the advancement of the litigation process." *MS Credit Center Inc.*, 926 at 180 (¶41).

II. **Whether the trial court erred in refusing to first decide the issue of whether the Claimants were fraudulently induced into signing the second contingency fee agreement containing the arbitration clause.**

¶22. The Claimants argue that the circuit court misapplied *Prima Paint Corp. v. Flood & Conklin Manufacturing Corp.*, 388 U.S. 395 (1967), by granting the Attorneys' motion to compel arbitration as to the Claimants whose second retainer contained an arbitration clause. In making its ruling, the circuit court relied upon *Virginia College LLC v. Blackmon*, 109 So. 3d 1050, 1053-54 (¶¶13-14) (Miss. 2013), where the Mississippi Supreme Court addressed claims of fraud in the inducement to enter into contracts containing arbitration agreements:

> A claim that a party was fraudulently induced to enter into a contract is not a sufficient basis for a trial judge to usurp the authority of the arbitrator to decide the issue, because federal law has clearly established that allegations of fraud in the inducement of a contract as a whole must be submitted to arbitration. We will not invalidate an arbitration provision on the basis of fraudulent inducement, **unless the complaint specifically and clearly alleges the party was fraudulently induced to enter into the agreement to arbitrate—which must be independent of any fraud inducing the contract as a whole**—and the claim must be pleaded with particularity.
>
> Virginia College argues that plaintiffs' fraud allegations are deficient because

12

they allege fraud in the making of the overall Agreement, and that **plaintiffs fail to allege any fraudulent misrepresentations specifically designed to persuade plaintiffs to arbitrate claims arising from the Agreement**. We agree. **The allegations of fraud—despite the generalized title of "Fraudulent Inducement of the Arbitration Provision" in the complaint—allege fraudulent inducement of the whole Agreement.**

(Footnotes omitted) (Emphasis added). We find that the amended complaint, the written responses, and the oral argument before the circuit court do not "specifically and clearly" allege that the Claimants were fraudulently induced to enter into the arbitration agreement contained in the second retainer by "any fraudulent misrepresentations specifically designed to persuade [the Claimants] to arbitrate claims arising from the [second retainer]" and that were "independent of any fraud inducing the contract as a whole." *Id*.

¶23. In the Claimants' supplemental response filed on April 17, 2020, they (arguably for the first time) clearly stated that they had been "fraudulently induced" to sign the second retainers:

> Defendants successfully obtained the signatures of 2,471 previously "unsigned claimants" through fraudulent inducement. Defendants lied to the "unsigned claimants" in their cover letters introducing the "new contracts", stating: We are attempting to resolve the claims of many PCB clients. We are hopeful that we may be able to negotiate a settlement of your potential claims as well. For us to do so, you must sign another retainer agreement, which is attached.

In support of their claim, they point to the increase in attorney's fees and the added arbitration agreement. They contend no one explained these differences from their original retainer agreements. They also contend that the Attorneys failed to advise them of all that had transpired in the litigation before they were sent the second retainer, specifically that a potential settlement had been reached. Even in this supplemental response, though, there is

13

no argument that shows "any fraudulent misrepresentations specifically designed to persuade [the Claimants] to arbitrate claims arising from the [second retainer]" that are separate and apart from a challenge to the entire second retainer. As the Mississippi Supreme Court noted in *Virginia College*, 109 So. 3d at 1054 (¶13), regardless of the label the Claimants may put on their argument, this Court finds that the alleged inducements relate to the whole second retainer. We find that the circuit court properly applied the law set forth in *Prima Paint Corp.*, 388 U.S. at 406. The Claimants' argument is not persuasive here.

### III. Whether it was a clear error of law to compel arbitration in this case because the Attorneys breached their fiduciary duty owed to the Claimants.

¶24. The Claimants argue that the Attorneys breached their fiduciary duty by failing to fully explain the terms of the contingency fee agreement and its ramifications. More specifically, they claim that it is "clear error of law and manifestly unjust to compel arbitration when the Attorney Defendants, who owed a fiduciary duty to their clients, failed to provide Plaintiffs with an adequate explanation of arbitration."[10]

¶25. While the record does contain deposition testimony from one client stating that the second retainer was not explained to him, the actual contract suggests otherwise. In fact, the last paragraph of the second retainer, directly above the line for the client's signature, states in all-capital letters:

> CLIENT ACKNOWLEDGES THAT CLIENT HAS READ THIS AGREEMENT IN ITS ENTIRETY AND THAT THE FIRM AND ITS ATTORNEYS HAVE ANSWERED ALL QUESTIONS OF CLIENT, IF

---

[10] This argument is also considered in part IV of this opinion in determining whether the Claimants have established procedural unconscionability of the second retainer.

14

ANY, CONCERNING THE AGREEMENT AND CLIENT UNDERSTANDS THE AGREEMENT AND CONSIDERS IT TO BE FAIR AND REASONABLE.

In *Slater-Moore v. Goeldner*, 113 So. 3d. 521, 530 (¶27) (Miss. 2013), the Mississippi Supreme Court stated:

> [T]he American Bar Association has stated that predispute arbitration agreements in attorney-client contracts are appropriate as long as the attorney complies with his fiduciary duty under ABA Rule 1.4(b). The rules require the attorney to give the client an adequate explanation by disclosing the advantages and disadvantages of arbitration. ABA Model Rules of Prof'l Conduct R. 1.4. (2012). Slater-Moore's signature is on page two of the two-page contract, directly below a clause stating that the contract was discussed in detail. The arbitration provision also is on page two of the contract.

In *Oaks v. Sellers*, 953 So. 2d 1077, 1082 (¶17) (Miss. 2007), the Mississippi Supreme Court stated:

> [A] person is under an obligation to read a contract before signing it, and will not as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract. Likewise[,] . . . [i]n Mississippi, a person is charged with knowing the contents of any document that he executes.

(Citations omitted). In this case, the Claimants that signed the new two-page second retainer signed directly under a clause that stated that they had read the agreement, that the attorneys had answered their questions, if any, concerning the agreement, and that the terms of the contract were fair and reasonable. The arbitration clause is on the same page directly above the acknowledgment clause set out above. One of the Attorneys' names and addresses is on the cover letter, and the Claimants were given a phone number to call if they had any questions.

¶26.    The Claimants failed to produce any evidence that they did not know what they were signing when they signed the second retainer.  There is no proof that the Claimants signed the second retainer involuntarily or that they were not given the opportunity to review the agreement and inquire about its terms.  There is no proof that any Claimant tried to contact the Attorneys to ask a question or get a better explanation of the agreement but were unable to do so.  There is no proof that an Attorney was not available to answer any question a Claimant may have had before signing the second retainer.  The Claimants' argument in this regard is without merit.

**IV.    Whether it is a clear error of law and manifestly unjust to enforce the arbitration provision in this case as both procedurally and substantively unconscionable.**

¶27.    The Claimants argue that because the arbitration provision is both procedurally and substantively unconscionable, it was clear error and manifestly unjust to enforce the provision.  Concerning the freedom to contract and the court's role in this area, the Mississippi Supreme Court held in *Smith v. Express Check Advance of Mississippi LLC*, 153 So. 3d 601, 607 (¶13) (Miss. 2014):

> So important to our Founders was the freedom to contract without interference from the government or the courts, that they constitutionally prohibited any State from passing any law "impairing the obligations of contracts."  That is not to say that our Founders believed courts should never, for any reason, set aside a contractual obligation.  But such instances should be the rare exception rather than the general rule; and the basis for granting such extraordinary relief to a contracting party should not be a judge's subjective conclusion that the contract is not fair.  Fairness is for the parties to decide.  That is why the doctrine of unconscionability traditionally has applied only to the most egregious of contractual situations.

(Footnote omitted).  In *LAGB, LLC v. Total Merchant Services Inc.*, 284 So. 3d 720, 727

16

(¶17) (Miss. 2019), the supreme court further stated:

> The party opposing arbitration bears the burden of proving that a contract defense applies in the particular case. The doctrine of unconscionability applies only to the most egregious of contractual situations. An unconscionable contract is "one such as no man in his senses and not under a delusion would make on the one hand, and as no honest and fair man would accept on the other." An unconscionable contract "affronts the sense of decency." **Procedural unconscionability** is established by showing "a lack of knowledge, lack of voluntariness, inconspicuous print, the use of complex legalistic language, disparity in sophistication or bargaining power of the parties and/or a lack of opportunity to study the contract and inquire about the contract terms." "The terms of a **substantively unconscionable contract** are so unreasonably favorable to one party that the contract imposes oppressive terms on the weaker party."

(Citations omitted) (emphasis added).

¶28. The Claimants argue on appeal that the second retainer is procedurally and substantively unconscionable. They contend that the Attorneys drafted the second retainer "with the intention of subjugating the [Claimants] to the arbitration clause as well as the increased contingency fee percentage." They argue that the second retainers were presented to them on a "take it or leave it" basis. Further, they submit that the Attorneys took advantage of their experience and the disparity in sophistication to obtain an agreement on terms overwhelmingly favorable to the Attorneys. Lastly, they contend that the second retainer is substantively unconscionable because it requires the application of commercial arbitration rules, which have higher fees than consumer arbitration rules.

¶29. As to the claim that the contract was presented on a take-it-or-leave-it basis, again in *Express Check Advance of Mississippi LLC*, 153 So. 3d at 607-08 (¶¶15-16), the court stated:

> The terms of a substantively unconscionable contract are so unreasonably favorable to one party that the contract imposes oppressive terms on the

17

weaker party. And unconscionability may be evidenced, but not established, by showing that the contract is one of adhesion.

Contracts of adhesion "are those that are 'drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms. Such contracts are usually prepared in printed form . . . .'" The contract before us may be one of adhesion. It appears to be a preprinted form contract prepared by Express Check. But Smith failed to present any evidence that the contract was presented on a take-it-or-leave-it basis. So we cannot know for sure. And even if we could, "finding a contract to be one of adhesion does not automatically mean that the contract or any provision thereof is substantively unconscionable." So, regardless, we must look to the agreement's terms to determine if they are oppressive.

¶30.    In the case at bar, the record shows that the Attorneys were working under a deadline BorgWarner established during mediation of the underlying PCB litigation. The time frame to obtain releases from potential claimants was part of the contingency of a proposed settlement, which could have fallen apart if the deadlines and numbers BorgWarner established were not met. Going forward with the settlement would result in these Claimants receiving compensation for perhaps questionable claims. At the time the Attorneys began trying to locate and sign these Claimants to the second retainer, the Claimants were unrepresented and had not filed a complaint to pursue their claim, and the statutory limitations period was running. Accordingly, there was a sense of urgency to locate the Claimants, get the needed documents signed, and move forward toward the potential settlement. However, as noted above, even if the contract was provided on a take-it-or-leave-it basis,[11] we must still look to the agreement's terms to determine whether they are

_____

[11] There is no evidence in the record that any Claimant attempted to contact the Attorneys and negotiate any provision of the contract. One of the Attorneys' names and addresses was on the letter, and a phone number was given if any Claimant had any

"oppressive."

¶31.    The only "oppressive terms" the Claimants point to are the five-percent increase in attorney's fees from the original retainer, the inclusion of an arbitration clause, and the cost of commercial arbitration as opposed to consumer arbitration.[12]  We find that the terms of the second retainer do not "affront the sense of decency."  The Claimants failed to meet their burden to show that the second retainer is either procedurally or substantively unconscionable.  This issue is without merit.

## V.    Retroactive Application

¶32.    Finally, the Claimants argue that the arbitration agreement should not be applied to the Attorneys' allegedly wrongful conduct that occurred before the agreement was executed. The Claimants first raised this argument concerning the retroactive application of the arbitration agreement in their motion for reconsideration.  We find they have waived this

---

questions.  There is no evidence that any Claimant did not have time to read and understand the agreement or seek advice before signing the agreement.

   [12] The evidence of the cost of commercial arbitration is contained in an attachment to the Claimants' motion for reconsideration.  This argument was not properly placed before the circuit court and is procedurally barred from consideration on appeal:

> Regarding the propriety of reconsidering a judgment, the United States Court of Appeals for the Fifth Circuit has stated that "'[r]econsideration of a judgment after its entry is an extraordinary remedy that should be used sparingly.'  A motion for reconsideration may not be used to rehash rejected arguments or introduce new arguments."  *LeClerc* [*v. Webb*], 419 F.3d [405,] 412 n.13 [(5th Cir.  2015)] (internal citation omitted).  Nor may it be used to "resolve issues which could have been raised during the prior proceedings."  *Westbrook* [*v. C.I.R.*], 68 F. 3d [868,] 879 [(5th Cir. 1995)] (citations omitted).

*Point S. Land Tr. v. Gutierrez*, 997 So. 2d 967, 976 (¶24) (Miss. Ct. App. 2008).

19

issue. *Id*. In any event, the Claimants argue that actions the Attorneys took, including negotiating the BorgWarner settlement on the Claimants' behalf and failing to explain or negotiate the arbitration agreement, fell outside of the scope of the arbitration agreement because these actions occurred before the second retainer was signed.

¶33. In *B.C. Rogers Poultry Inc. v. Wedgeworth*, 911 So. 2d 483, 488 (¶13) (Miss. 2005), the Mississippi Supreme Court highlighted the distinction the Fifth Circuit made between "narrow" and "broad" arbitration clauses, classifying a clause as narrow when it limits arbitration to claims that "arise under the contract." The court in *B.C. Rogers* further explained:

> [I]f an arbitration clause contains retroactive time-specific language, e.g., a phrase reading "this agreement applies to all transactions occurring before or after this agreement," then the court may apply the arbitration provision to events relating to past events. Or, if the arbitration clause contains language stating that it applies to "all transactions between us" or "all business with us," then [the court] may apply the arbitration clause retroactively.

*Id.* at 489 (¶18) (quoting *Beneficial Nat'l Bank v. Payton*, 214 F. Supp. 2d 679, 688-89 (S.D. Miss. 2001)).

¶34. The arbitration agreement in this case states in part that the arbitration provision pertains to the following:

> **Any and all disputes, controversies, claims or demands arising out of or relating to this agreement or any provision hereto**, including but not limited to **service of the attorneys to Client**, distribution of proceeds, expenses charged, fees paid or other attorneys, or **any matter related to the relationship between attorneys and Client whether in contract or tort or otherwise**, at law or in equity, for damages or any other requested relief shall be resolved by binding arbitration . . . .

(Emphasis added). The Claimants had previously been represented by the Attorneys in the

PCB litigation. While the Attorneys had released the Claimants from their prior retainer agreement, the Attorneys continued to represent other parties in the same litigation. As a result of their representation of other plaintiffs, the Attorneys became aware of an opportunity to include the Claimants in a settlement. The Claimants were informed of this settlement opportunity in the cover letter sent with the second retainer. The language in the new agreement provided above purported to include any and all disputes or claims relating to this agreement or "any provision hereto" (the PCB litigation) or any matter related to the relationship between the Attorneys and the Claimants "whether in contract or tort or otherwise." Based on the facts in this record and the language of the second retainer, this arbitration agreement falls within the "broad" category defined by *B.C. Rogers Poultry Inc.*, 911 So. 2d at 488 (¶13), and may be applied to the allegedly wrongful conduct that occurred before the Claimants signed the second retainers.

## CONCLUSION

¶35. Based upon our analysis above, we affirm the circuit court's order granting in part the motion to compel arbitration in this matter.

¶36. **AFFIRMED.**

**BARNES, C.J., AND CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE AND SMITH, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McCARTY, J., NOT PARTICIPATING.**

21